Matthew A. WELCH, d/b/a Jakmaw Associates, Plaintiff,

v.

Kevin A. PAICOS, individually, and in his official capacity as Town Administrator of the Town of Easton, the Town of Easton, Jeffrey Tufts, Patricia Hunt, William Hardin, Fred Clark, and Daniel Churchill, individually, Defendants.

No. CIV. A. 96–12316–WAG.

United States District Court, D. Massachusetts.

Sept. 2, 1999.

Jeffrey S. Robbins, Timothy J. Langella, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Plaintiff.

Charles B. Straus, III, Joseph M. Hamilton, Mirick, O'Connell, DeMallie & Lougee, Worcester, MA, Thomas Drechsler, Finneran & Byrne, William L. O'Brien, Finneran & Byrne, Dorchester, MA, Frank A. Smith, III, Frank A. Smith III & Associates, PC, Samuel Perkins, Brody, Hardoon, Perkins & Kesten, Boston, MA, for Defendants.

### MEMORANDUM OF DECISION

GARRITY, District Judge.

In this constitutional tort case, plaintiff Matthew A. Welch d/b/a Jakmaw Associates ("Welch") alleges that defendants Town of Easton and various Town officials violated his rights to petition for redress of grievances, to free speech, and to procedural and substantive due process. Plaintiff is a developer; defendants Jeffrey Tufts, Patricia Hunt, William Hardin, Fred Clark and Daniel Churchill are present and former Easton Selectmen; defendant Kevin Paicos is Easton's Town Administrator. This action arose when plaintiff sought to expand a development within Easton, but could proceed only with approval from the Town's Board of Selectmen. Plaintiff's allegations center on his attempts to appear before the Selectmen to discuss this development, and what he calls their impermissible refusal to allow this appearance. Arguing that Paicos and the Selectmen have worked together to thwart his desired expansion, and that Easton is liable for the actions of these officials, plaintiff seeks an injunction allowing him to build, and compensation for his alleged damages already sustained. After exhaustive and often contentious discovery, defendants Paicos, Tufts, Hunt, Hardin, Churchill and the Town have moved for summary judgment.[1] We grant this motion in part, and deny it in part.

---

1. Defendant Clark has not moved for summary judgment. For brevity, we often refer to the moving defendants as "defendants."

## I. BACKGROUND

### A. Massachusetts Law

At least since the Second World War, our nation has faced the challenge of building homes that its poorer citizens can afford. *See generally Affordable Housing and Urban Redevelopment in the United States* (Willem van Vliet ed.1997). To build such affordable housing, of course, a planner or developer must locate a suitable construction site. There lies a rub: almost inevitably, wherever a development is planned, local residents will resist the construction of affordable homes. *See* Advisory Commission on Regulatory Barriers to Affordable Housing, Department of Housing and Urban Development, *"Not In My Back Yard": Removing Barriers to Affordable Housing* (1991). Many suburban and rural communities have fiercely opposed construction of local affordable housing. *See, e.g., Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). Such opposition may not be overt or even conscious: municipal zoning, permitting, and construction policies can frustrate or delay affordable housing, whether or not local authorities adopted them with such intent. *See* Paul K. Stockman, Note, *Anti–Snob Zoning in Massachusetts: Assessing One Attempt at Opening the Suburbs to Affordable Housing,* 78 Va. L.Rev. 535, 539–42 (1992). For these as well as other reasons, the national supply of affordable housing remains well below demand. *See id.* at 535–37.

Massachusetts first addressed this situation in 1969, when its legislature passed "An Act providing for the construction of low or moderate income housing in cities and towns in which local restrictions hamper such construction." Mass. Acts 1969, ch. 774 ("the Act") (codified as amended at Mass. Gen. Laws ch. 40B, §§ 20–23 and ch. 23B, § 5A (West 1994)).[2] The Act, sometimes known as the 'anti-snob zoning act,' was enacted "to provide expeditious relief from exclusionary local zooming by-laws and practices which might inhibit the construction of low and moderate income housing in the Commonwealth's cities and towns." *Zoning Bd. of Appeals of Greenfield v. Housing Appeals Comm.,* 15 Mass. App.Ct. 553, 555, 446 N.E.2d 748 (1983) (Greaney, J.) (citing *Board of Appeals of Hanover v. Housing Appeals Comm.,* 363 Mass. 339, 353–54, 294 N.E.2d 393 (1973)).

Under the Act, developers of subsidized housing follow a single, simple process. They need not seek the myriad permits from various agencies normally required for substantial construction; the Act thus shields these developers from seriatim municipal delays. Instead, qualified developers file only one application, addressed to the local Zoning Board of Appeals, or ZBA.[3] Within thirty days of its filing, the ZBA must hold a public hearing on this application. *See* Mass. Gen. Laws ch. 40B, § 21. Within forty days of the hearing, after considering comments from affected local agencies, the ZBA must decide on the application's merit. If the ZBA approves the application, it must immediately grant an extraordinary approval called a comprehensive permit.[4] The comprehensive permit supersedes most local

---

Plaintiff also sought summary judgment on his procedural due process claim. After hearing oral argument, we denied this motion from the bench.

2. The Act was "the first state legislation to address directly suburban exclusionary zoning." Stockman, *supra,* at 537. Several other states have since adopted similar legislation. *See* Note, *State–Sponsored Growth Management as a Remedy for Exclusionary Zoning,* 108 Harv. L.Rev. 1127, 1133–36 (1995).

3. *See* Mass. Gen. Laws ch. 40B, § 21. In a Town such as Easton, the Board of Selectmen appoints the members of the ZBA. *See* Mass. Gen. Laws ch. 40A, § 12 (West 1994).

4. If the ZBA fails to hold the hearing or to issue its decision within the time allowed, "the application shall be deemed to have been allowed and the comprehensive permit or approval shall forthwith issue." *Id.*

procedures and allows construction to commence.[5]

If the ZBA denies the comprehensive permit, or grants it only "with such conditions and requirements as to make the building or operation of [the] housing uneconomic," the developer can appeal to the Housing Appeals Committee, or HAC.[6] The HAC's review "shall be limited to the issue of whether, in the case of the denial of an application, the decision of the [ZBA] was reasonable and consistent with local needs."[7] If the HAC finds that the ZBA's denial was reasonable and consistent with local needs, it will affirm the ZBA's denial of the comprehensive permit. Should the HAC find otherwise, it must reverse the ZBA and issue the permit.

To qualify for the Act's simplified process and procedural protections, a developer cannot simply decide to build inexpensive homes. The Act oversees only permit applications for "housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute."

Mass. Gen. Laws ch. 40B, § 20. As a result, the scope of the Act's protection turns on the meaning of "subsidized," which the Act does not itself define.[8] In decisions interpreting this term, ZBAs and the HAC adopted a narrow construction, reading it "to mean financial subsidies only." Mass. Regs.Code tit. 760, § 45.01. Under this definition, "cities and towns . . . had little incentive to undertake housing initiatives which [did] not require direct state or federal financial assistance, but which in other respects [were] within the intent of the statute." *Id.* To bring otherwise-unsubsidized programs under the Act, and thus to provide this incentive, the Executive Office of Communities and Development ("EOCD") developed the Local Initiative Program ("LIP").[9]

Under the LIP, the EOCD provides "subsidy, in the form of technical assistance, to each [development] approved as part of the Local Initiative Program."[10] This assistance constitutes the subsidy required by the Act, and thus brings a development "within the comprehensive permit

---

**5.** *See Board of Appeals of Hanover,* 363 Mass. at 346–60, 294 N.E.2d 393. The comprehensive permit notwithstanding, a developer effectively cannot proceed without local cooperation, e.g., through water 'and sewer hookups. *See infra* at 19.

**6.** Mass. Gen. Laws ch. 40B, § 22. In addition, "[a]ny person aggrieved by the issuance of a comprehensive permit" may use the normal procedure for judicial review of zoning decisions. Mass. Gen. Laws ch. 40B, § 21; *see also id.* ch. 40A, § 17 (West 1994).

**7.** Mass. Gen. Laws ch. 40B, § 23. The Act provides a safe harbor: once a town's stock of affordable housing reaches certain levels, the HAC must automatically find denials by the local ZBA to be reasonable and consistent with local needs, *see* Mass. Gen. Laws ch. 40B, § 20, making the ZBA's decision effectively final. Easton does not allege that it qualifies for this safe harbor.

**8.** The HAC's decision is subject to judicial review according to regular Massachusetts administrative procedure. *See* Mass. Gen. Laws ch. 40B, § 22; *id.* ch. 30A, § 14 (West 1992). This review is fairly deferential; the

courts consider only "whether there was 'substantial evidence' to support those decisions, that is, 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Board of Appeals of Hanover,* 363 Mass. at 376, 294 N.E.2d 393 (quoting Mass. Gen. Laws ch. 30A, §§ 1(6) & 14(8)(e)).

**9.** In 1996, the Massachusetts legislature transferred the functions of the EOCD to the Department of Housing and Community Development. *See* 1996 Mass. Acts ch. 151, § 634; *id.* ch. 204, § 126. No party alleges that this change affected the issues in this action. For simplicity, we refer throughout to the EOCD.

**10.** Mass. Regs.Code tit. 760, § 45.05. Such technical assistance "may include, but is not limited to, assistance in evaluating sites, selecting developers, reviewing development proposals, determining project feasibility, and monitoring compliance with Use Restrictions and Regulatory Agreements." *Id.* The regulations do not require the assistance to be more than *pro forma.* The Massachusetts courts have not examined this provision in a reported opinion.

process" of the Act. *Id.* § 45.01. To receive such technical assistance, a developer must meet the somewhat complicated LIP qualification criteria:

> The Department shall, upon application from the Chief Elected Official of a city or town, certify that a housing development is a valid Comprehensive Permit Project if such development meets the following minimum requirements: (1) at least 25% of the units in such development will be Low and Moderate Income Units; (2) the developer will execute a Regulatory Agreement; (3) the units will be subject to Use Restrictions for the longest period of time allowed by law; (4) the developer or owners of the project will implement an affirmative fair marketing plan in a form approved or required by the Department; and (5) the project has the written support, where applicable, of the Local Housing Partnership.

Mass. Regs.Code tit. 760, § 45.04 (West 1999).[11] Once approved by the EOCD under the LIP regulations, a project would qualify for, and eventually move through, the application process defined by the Act. To receive a comprehensive permit, a developer of affordable housing receiving no direct subsidy must therefore follow a multistep procedure along these lines:

(1) The developer selects a suitable site and formulates a development plan meeting the LIP criteria.

(2) The developer secures the written support of the local housing partnership.

(3) The developer signs a regulatory agreement with the EOCD and the municipality.

(4) The municipality's chief elected official submits a LIP application to the EOCD.

(5) The EOCD approves this application and authorizes technical subsidy, qualifying the development under the Act.

(6) The developer submits an application to the ZBA, asking for a comprehensive permit.

(7) The ZBA or HAC grants this application.

(8) Using the resulting comprehensive permit, the developer builds the project.

In the matter before us, plaintiff successfully negotiated this bureaucratic labyrinth, apparently to the satisfaction of most parties involved. Trouble soon arose, however, when Welch sought to enlarge his development beyond the permitted size, and thus to modify his outstanding comprehensive permit.

The Act does not contemplate modifications to already issued comprehensive permits. Similarly, the regulations governing LIP projects do not discuss modifications proposed after a project is approved. Massachusetts regulations do, however, provide a general mechanism for reviewing changes to comprehensive permits. *See* Mass. Regs.Code tit. 760, § 31.03(3). This procedure applies to comprehensive permit projects in general, not LIP projects in particular. Under § 31.03(3), a comprehensive permit holder wishing to modify his permit must submit the proposed modification to the ZBA. Within 20 days, the ZBA must classify the proposal as a substantial or insubstantial change. *See* § 31.03(3)(a). If the ZBA finds the proposal to be insubstantial, or fails to make a timely decision, the comprehensive permit

---

**11.** In a town such as Easton, the Board of Selectmen acts as the chief elected official. *See* Mass. Regs.Code tit. 760, § 45.02.

A local housing partnership is "a municipal advisory group, with responsibility for encouraging low and moderate income housing, which has been appointed by the Chief Elected Official and which has been recognized by the Massachusetts Housing Partnership

Fund." *Id.* The parties appear to agree, and we assume for our purposes, that the Easton Housing Partnership ("EHP") was at all relevant times such a local housing partnership.

A low and moderate income unit is one priced affordably to, and restricted for purchase by, "a household with income at or below 80% of the regional median household income." *Id.*

is deemed modified. *See* § 31.03(3)(b). If the ZBA considers the change substantial, however, it must hold a hearing on the change, exactly as for a new permit, but considering only "[o]nly the changes in the [permit] or aspects of the [permit] affected thereby." § 31.03(3)(c). The ZBA's determination of substantiality or lack thereof, as well as its eventual findings on the merits of a substantial modification, can be appealed to the HAC. *See* § 31.03(3)(c), (d).

LIP projects such as plaintiff's development, however, are governed not only by the Act and its regulations, but also by the EOCD's rules for LIP projects. These are set forth in the "Local Initiative Program Guidelines," a public document published by the EOCD. These guidelines contemplate modifications to LIP projects made "during the permitting process," but do not discuss changes made after the comprehensive permit is issued:

> All Comprehensive Permit Projects undertaken through the Local Initiative Program must ... have the written endorsement of the chief elected official
> ....
> No further evidence of local support is required once a Comprehensive Permit Project has been approved by EOCD. The only exception is for projects which undergo substantial changes during the permitting process that render them inconsistent with the conditions of prior state and local approval.

Pl.'s Ex. 45.[12] When plaintiff sought to expand his development, thus, neither the Act, the regulations, nor the administrative guidelines explicitly stated what process a developer should use to modify a comprehensive permit granted to a LIP program.

During most of the events leading up to this action, plaintiff contended that § 31.03(3) governed any modifications to his comprehensive permit. Thus, he concluded, he could modify his project with approval from the EHP and ZBA, without going to any other board. The EOCD, in contrast, contended that § 31.03(3) did not control, and that plaintiff must obtain EOCD approval before proceeding to the ZBA. The EOCD relied on the LIP regulations in Mass. Regs.Code tit. 760, ch. 45, the Local Initiative Program Guidelines, and the regulatory agreement governing plaintiff's development, which required EOCD approval of all changes. As noted above, the EOCD required "further evidence of local support" by the Selectmen only "for projects which undergo substantial changes."

The Town of Easton took a third view. Easton was a co-applicant for plaintiff's original LIP approval, the Town argued, and such municipal sponsorship was required by Mass. Regs.Code tit. 760, § 45.04. As a result, the Town concluded, plaintiff could not make any change to his development, no matter how insubstantial, without the approval of the Selectmen. Only with this approval could plaintiff proceed before the EOCD and, eventually, the ZBA. Thus the developer, the Town, and the agency held different conceptions of the procedure necessary to modify a LIP development subject to a comprehensive permit.

The Massachusetts courts eventually resolved this dispute, ruling largely in favor of the EOCD. In this action, plaintiff presses constitutional claims related to, but separate from, this state litigation. As we must on summary judgment, we present the facts in the light most favorable to plaintiff, the non-moving party. *See Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir.1999).

### B. Facts

This action centers on Easton Country Estates ("the Estates"), plaintiff's development in Easton, Massachusetts. It also involves several long-running and some-

---

**12.** This language remains in the current version of the LIP guidelines, issued in May 1997.

times vociferous disputes between plaintiff, an Easton resident, and defendant Town officials. Welch contends, in part, that these disputes improperly predisposed defendants against his development, violating his constitutional rights. Because Welch's claims implicate the influence these quarrels had on the Estates' progress through municipal channels, and thus on the confluence of several chains of events, we present the relevant facts chronologically, the better to plumb their alleged interaction.

The roots of this action trace at least to 1990, when Michael Sites became a member of the Easton Conservation Commission.[13] Sites had a skeleton in his closet: in 1987 he had resigned, in lieu of disbarment, from the practice of law. In so doing, he acknowledged transgressions including conversion of client funds, disclosed his addiction to alcohol over the period of his misdeeds, and described his subsequent treatment for alcoholism. The Supreme Judicial Court accepted Sites' resignation. *Michael G. Sites,* No. 84–24BD (Mass. Aug. 2, 1989).

Two years after Sites joined the Conservation Commission, in a letter to the Selectmen dated October 19, 1992, plaintiff expressed his "outrage[ ] that Mr. Sites [had] been appointed to a position of trust and sensitive nature within the Town of Easton," despite his prior offenses.[14] Two days later, Welch wrote directly to Paicos, as Town Administrator, again arguing that Sites should not occupy a position of

trust.[15] Neither Paicos nor the Selectmen took action against Sites in response to these letters,[16] nor did Welch pursue the issue with defendants. In 1994, Sites became Chairman of the Conservation Commission.

During this period, plaintiff was also designing the Estates. Welch planned the Estates as a LIP development; it could not proceed without approval from the Selectmen, acting as Easton's chief elected official. Plaintiff originally hoped the Estates would comprise around 130 units, one-quarter of which would be priced below market. When the Selectmen criticized this proposal as too large, plaintiff scaled the Estates back to 76 units, with 19 priced below market. *See Welch v. Executive Office of Communities and Development,* 44 Mass.App.Ct. 1103, 688 N.E.2d 475 (table), No. 96–P–447, slip op. at 1–3 (Dec. 2, 1997) [hereinafter *Welch v. EOCD* ], *review denied,* 427 Mass. 1101, 692 N.E.2d 963 (1998). On February 8, 1993, Ken Love and John Keach presented the revised, 76–unit plan to the Selectmen. Though the meeting's minutes are not explicit, Love apparently represented the EHP, while Keach appeared for Jakmaw Associates. The EHP had endorsed the project, Love explained, subject to further review by a state consultant. After this presentation, the Selectmen decided to reconvene later, to hear more detailed information on the project.

---

**13.** It is not fully clear how Conservation Commission members attain their positions. Plaintiff states that they are "appointed by Paicos and the Board of Selectmen," but provides no documentation to support this claim. Pl.'s Facts ¶ 24; *see also* Pl.'s Revised Facts ¶ 24. It appears that members of the Conservation Commission are appointed by the Selectmen. *See* Sites Dep. at 59; Paicos Dep. at 16–17.

**14.** Paicos believed that Welch obtained this information through a private investigator, in order to coerce Sites, who had refused to alter Conservation Commission records at plaintiff's request.

**15.** In this letter, Welch accused Sites of practicing law without a license, and adverted to a complaint on this subject filed with the Board of Bar Overseers. Apparently, he filed this complaint on the same day. *See* Paicos Dep. at 15; Sites Dep. at 65. The Bar Overseers apparently found no wrongdoing. *See* Paicos Dep. at 20; Sites Dep. at 93.

**16.** Paicos testified that he had no authority over Sites, and therefore took no action. *See* Paicos Dep. at 16–17. Tufts stated that, by the time these allegations came to light, Sites had a good history with the Town, and "obviously whatever problems he had were behind him." Tufts Dep. at 148; *see id.* at 147–152.

Before this second hearing took place, plaintiff renewed his investigation into Easton officials, newly focused on defendant Paicos. On February 22, 1993, through his attorney Sheldon Drucker, plaintiff requested, under Massachusetts' public-records law,[17] Paicos' resume, his cover letter applying for employment as Town Administrator, minutes of certain executive sessions of the Selectmen, and Article 10–8 of the Easton By–Laws, "pertaining to Military Leave." [18] On March 3, Paicos wrote to Welch, informing him that his public-records request had been referred to Town Counsel. Paicos went on to describe a phone conversation with Welch:

> In our conversation you made it perfectly clear that you intended to make a "reprisal" against me for my actions regarding the processing of your allegations against Conservation Commission member Michael Sites.
>
> You have indicated that such reprisal is taken against me in my official capacity as Town Administrator.
>
> . . . . .
>
> Your manner throughout this conversation was overbearing and coercive. You have made clear your intentions to conduct some sort of smear campaign against me, as a reprisal for my various official actions as Town Administrator.

This letter is to advise you of my intent to seek the assistance of private counsel, as well as law enforcement authorities including the District Attorney and Attorney General. Your activities as described in this letter are yet a further example of your attempt to coerce Easton public officials to yield to your will in an inappropriate manner. The activities you have begun with members of the Easton Conservation Commission, and now with me[,] are repugnant to the proper democratic functioning of local government.

Pl.'s Ex. 13. Neither Paicos nor the Town gave Welch the documents he had requested. As far as the record shows, plaintiff did not immediately renew or follow up on this request.

The Selectmen's second hearing on the Estates took place as scheduled, on March 23, 1993. The meeting convened in a larger room for a renewed presentation and public discussion of the Estates proposal, again describing a 76–unit development. Paicos was present. After a question-and-answer period, the Selectmen voted, 3–2, to approve the project. Defendants Clark and Hardin, along with then-Selectman Kathleen McDonald, supported the resolution; defendants Tufts and Hunt opposed.

On April 7, 1993, plaintiff filed papers with the EOCD, requesting LIP status for the Estates.[19] Exactly as presented to the

17. Massachusetts provides a "broadly defined" right of access to public records, subject to limited, enumerated exceptions. *Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co.*, 414 Mass. 609, 614, 609 N.E.2d 460 (1993); *see* Mass. Gen. Laws ch. 66, § 10 (West Supp.1998) (public-records law).

18. Pl.'s Ex. 12. Plaintiff apparently sought information regarding Paicos' former job as Town Administrator of Winchendon, Massachusetts. *See* Pl.'s Facts ¶¶ 41–45; Pl.'s Revised Facts ¶¶ 41–45. According to plaintiff, Winchendon forced Paicos to resign after he threatened to terminate the Winchendon Treasurer for questioning his decision, later ruled to be improper, to transfer funds out of the town's pension fund. Paicos disputes this account in several material particulars. *See*

Paicos Dep. at 782–793. No party alleges that Paicos profited personally, or intended to do so, from these events.

Plaintiff apparently also sought information as to whether a certain payment in lieu of military leave, awarded to Paicos in December 1989, was proper. The record does not clearly elucidate the circumstances surrounding this payment, the understanding on which it was awarded, or the alleged impropriety involved. In this action, of course, the exact nature of the accusation is not necessarily material—only whether defendants retaliated against it by denying plaintiff his civil rights.

19. As far as appears from the evidence submitted, the application was actually filed by Phil Corbett of Canton, Mass. Mr. Corbett is elsewhere described as plaintiff's "developer consultant." Plaintiff, however, was involved

Selectmen, the application proposed building 76 homes, with 19 priced below market. The below-market units would have three bedrooms, cost $80,500, and be available only to households earning $33,000 or less annually. Fifteen of the nineteen would be reserved for Easton residents or town employees. The market-rate units would sell from $125,000 to $165,000.

On April 21, the EOCD confirmed receipt of this application, but noted that the papers filed were incomplete:

> While the required community support letter was included in the application, the community information sheet is missing from the application submitted to EOCD. We cann not [sic] begin the application review process until the application is complete. The missing information is labeled page 3 in the application form and should be filled out with all applicable local official information and signatures. This section should include a dated signature of the chief elected official confirming review of the attached application.

Pl.'s Ex. 4; Defs.' Ex. A. Plaintiff presumably submitted the required information, for on June 3, 1993, the EOCD approved the application and conferred LIP status on the Estates. This approval included several conditions. First, "the specifics of this project must be formalized in a regulatory agreement signed by the municipality, the project sponsor, and EOCD prior to starting construction." In addition, several "conditions . . . must be met prior to final EOCD approval," including:

> 2. EOCD must approve any changes to the application we have just reviewed and approved, including but not limited to alterations in unit mix, sales price, development team, unit design or site plan. As the Easton Country Estates local initiative homes near completion of

construction, EOCD staff will visit the site to ensure that the development meets program guidelines.

Defs.' Ex. B. The EOCD's approval qualified the Estates as subsidized housing under the Act, allowing plaintiff to seek a comprehensive permit for the development.

Plaintiff promptly sought a comprehensive permit from the Easton ZBA.[20] On July 14, 1993, the ZBA held the required public hearing. No one spoke against plaintiff's request, and the ZBA unanimously granted it. The approval was conditioned upon, *inter alia*, "[c]ompliance with all conditions and requirements of EOCD approval as stated in EOCD letter dated June 3, 1993." Defs.' Ex. C. The approval waived several Easton regulations, but noted that "[a]ll Town of Easton and Commonwealth of Massachusetts rules, regulations and zoning by-laws shall be complied with except those modified by this decision." *Id.*

On November 17, 1993, plaintiff, the EOCD, and the Town signed the regulatory agreement mentioned in the EOCD's approval letter and required by Mass. Regs.Code tit. 760, § 45.04. The agreement governed the design of the affordable homes, including requirements regarding their size, construction, and pricing, and requiring deed restrictions designed to prevent their resale at market rates. The agreement also restricted plaintiff's profit to 20% of his total development costs. It allowed amendments only if "in writing and executed by all of the parties" to the agreement. Defs.' Ex. D.

Several months passed without relevant event. Then, in early 1994, plaintiff sought to modify his plan for the Estates ("First Modification"). If allowed, the First Modification would increase the developed area by 3.2 acres, reduce the total

---

from the beginning; he received, for example, copies of correspondence between Corbett and the EOCD. The parties do not allege that Corbett's presence as applicant of record affects their positions in this action.

20. The petition, No. 93–08, was filed by Matthew A. Welch and John A. Keach together d/b/a JakMaw Associates.

units from 76 to 75, and increase the number of below-market units from 19 to 21.[21] In proposing this modification, plaintiff did not seek approval from the Selectmen or EOCD. Following his interpretation of Massachusetts law, plaintiff sought approval only from the EHP and the ZBA. The EHP endorsed the First Modification on January 24, 1994. After a hearing on March 2, 1994, the ZBA approved the First Modification in a decision filed with the Town Clerk on March 9, 1994. Under plaintiff's conception of governing Massachusetts law, he could now implement the modification. Under the Town's or the EOCD's, he could not.

Shortly thereafter, plaintiff again filed a public-records request seeking information on Paicos' employment background. On March 14, 1994, Welch wrote Paicos to request "[a]ny and all documents submitted by [Paicos] in his application for employment as ... Town Administrator." Paicos declined to tender any responsive documents.

Later that day, the Selectmen held a regularly scheduled meeting. The topic of the Estates was on the agenda. Plaintiff was present. The Selectmen addressed the Estates, however, well after the time scheduled for its discussion had passed and plaintiff had left the meeting. No party submitted evidence showing the substance of this discussion. The Selectmen took no recorded action.

On March 18, 1994, nine days after the ZBA filed its approval of the First Modification and four days after plaintiff again requested Paicos' employment documents, the Town reacted to the First Modification. In a memorandum sent to Easton permitting authorities and copied to Welch and the EOCD, Paicos ordered:

As you may be aware the developer of the comprehensive permit housing project off Eastman Street [the Estates] recently proposed substantial changes to

his project. The Board of Appeals has approved these changes.

The Board of Selectmen, as one of the original permitting/review agencies[,] has asked the Executive Office of Communities and Development to determine if the Board may also review those proposed changes.

Pending some resolution of this issue, no town agency may issue any permit, license or permission of any time.

Pl.'s Ex. 28; Defs.' Ex. E. Presumably alerted by the Paicos memorandum, the EOCD wrote a stern rebuke to Welch. In a letter dated March 23, 1994, the EOCD informed plaintiff of its legal position, essentially, that he would have to repeat the LIP process before he could implement the First Modification:

It has come to our attention ... that you may be considering modifications to the approved development plan for this project. I would like to take this opportunity to remind you of condition 2 of the June 3, 1993 approval letter for this project which requires review and approval of any development plan changes by EOCD. Should you choose to modify the approved development plan, please submit documentation of all aspects of the proposed change to this office accompanied with evidence of support of the local housing partnership and the chief elected official.

Defs.' Ex. F. Meanwhile, pursuant to the Paicos memorandum, the Town denied the Estates at least one municipal permit.

On April 4, 1994, Welch filed suit in Bristol County Superior Court, seeking declaratory relief and an order restraining the permit moratorium created by the Paicos communique. Shortly thereafter, in a letter dated April 6, 1994, the Selectmen advised plaintiff that "approval of the Board of Selectmen, as municipal sponsor, of proposed modifications is required un-

---

**21.** The First Modification would also alter the unit mix, shifting 18 units to free-standing homes from duplex, or semidetached, homes. Finally, the First Modification would change the street layout of the Estates, and would move certain units.

der the Local Initiative Program." Defs.' Ex. H. The letter invited Welch to submit an application to the Selectmen "for approval of municipal sponsor . . . regarding your proposed modifications." *Id.*

Five days after the Selectmen's letter, the court enjoined interference with permit applications made under the original comprehensive permit, but allowed the Town to block permits affected by the First Modification. *See Welch v. Paicos,* No. C94–00504 (Super.Ct. Apr. 11, 1994). The court further required that Welch "verify . . . that each permit, license or permission relates to his original Comprehensive Permit project . . . and not to any changes in the Comprehensive Permit project." *Id.* No party states that others violated this order; there is no record of an appeal.

On the day of the court's decision, plaintiff made another public-records request. In a letter to the Selectmen dated April 11, 1994, Welch identified an article in the Brockton Enterprise describing the Selectmen's investigation into allegations Welch had previously made. The story reported the Selectmen's conclusion that Welch's allegations were untrue. In his letter, Plaintiff requested "[a]ny and all documents" regarding these investigations and conclusions.

Meanwhile, plaintiff filed a petition with the Commonwealth's Supervisor of Public Records, challenging Paicos' refusal to disclose his employment documents. On May 3, 1994, the Supervisor ordered Paicos to disclose a redacted copy of his resume, omitting descriptions of prior employment, specific college courses taken and specific grades received. Paicos did not obey this order.[22]

22. Such refusal is not illegal. When public officials refuse to produce documents as ordered by the Supervisor, a court may order compliance with the statute. *See* Mass. Gen. Laws ch. 66, § 10(b). In so doing, however, the Massachusetts courts re-examine the merits of a request, and may reverse or modify the Supervisor's order. *E.g., Globe Newspa-*

On May 6, 1994, plaintiff again filed suit in Bristol County Superior Court, this time seeking to compel production of the documents listed by his three outstanding records requests—two for papers relating to Paicos' hiring, and one for records relating to the Selectmen's consideration of his allegations. The suit named, in their official capacities, defendants Paicos, Tufts, Hunt, Hardin, and Clark, as well as then-Selectman Kathleen McDonald. The officials defended their withholding of these documents under exceptions to the public records law protecting confidential personnel information and maintaining the attorney-client privilege. *See Welch v. Paicos,* No. 94–00717, slip op. at 1–2 (Super. Ct. June 30, 1994) (Travers, J.) [hereinafter *Welch Public Records Case I* ].

One month later, the parties settled one of their disputes. Plaintiff, the Town, and the EOCD reached an agreement allowing Welch to implement the First Modification. The Selectmen approved this modification on June 6, 1994, and the EOCD approved it on June 30. On the same day, the Bristol Superior Court denied Welch's request for records relating to discussion of his allegations, and ordered in camera review of records relating to Paicos' hiring. *See Welch Public Records Case I,* slip op. at 5–6. The Selectmen tendered the requested documents to the court.

On July 27, 1994, Welch and the EOCD signed an amendment to their regulatory agreement. The amendment codified the parties' agreement to allow the First Modification, and provided that "[a]ny further modifications to the Project, including but not limited to alterations in the unit mix, sales price, development team, unit design or site plan must be approved by EOCD."[23]

*per Co. v. Boston Retirement Bd.,* 388 Mass. 427, 442, 446 N.E.2d 1051 (1983). Indeed, in deciding Welch's claims, the Bristol Superior Court did exactly that. *See infra* at 151.

23. Pl.'s Ex. 70. Though the amendment anticipated signatures by plaintiff, the EOCD, and the Town, the Town did not sign on July

Within a few months, plaintiff again proposed a modification to the comprehensive permit governing the Estates. The Second Modification would add 62 single-family units, including 17 below-market units, to the existing 75–unit development. The Estates would expand onto 44 acres of adjacent property also owned by Welch. If the Second Modification was approved, the Estates would include 137 units, including 38 priced below market; it would thus approximate the plaintiff's original proposal, later reduced at the Town's request. At a meeting on September 21, 1994, the EHP approved the Second Modification, adding a few immaterial provisos.

Two weeks later, the Bristol court completed its in camera review and ruled on the remaining public-records requests. *Welch v. Paicos*, No. 94–00717, slip op. at 2 (Super.Ct. Oct. 6, 1994) (Tierney, J.) [hereinafter *Welch Public Records Case II* ]. The court ordered disclosure of Paicos' cover letter and resume, except for his grade-point average, *see id.* at 5, and minutes of executive sessions regarding Paicos' military leave payment. *See id.* at 6–7. The defendants disclosed the documents and did not appeal.

On the following day, October 7, 1994, plaintiff asked the ZBA to approve the Second Modification. Despite the requirement of prior EOCD approval expressed in the EOCD's approval letter and the origi-

nal regulatory agreement, and reiterated in Item 7 of the amended agreement, plaintiff persisted in his interpretation of Massachusetts law, and went directly to the ZBA without clearance from the EOCD. On October 20, the ZBA found that the Second Modification constituted a substantial change from the outstanding permit, *see* Mass. Regs.Code tit. 760, § 31.03(3)(a), and scheduled the hearing required to consider any substantial change. *See id.* § 31.03(3)(c); *see generally supra* at 144–45.

On October 26, 1994, plaintiff wrote the Selectmen, asking "to be put on the agenda of your Board to discuss Easton Country Estates." On November 1, 1994, the ZBA held a hearing on the Second Modification, which it took under advisement. On November 7, 1994, in a letter signed by defendant Hunt, the Selectmen responded to plaintiff as follows:

> In response to your letter of October 26, 1994, the Board of Selectmen understands that you are interested in making a substantial modification to your LIP project on Eastman Street [the Estates]. When you have submitted your application for the approval of this Board in accordance with the regulations, we will process your request for a hearing.

Pl.'s Ex. 36.[24] Plaintiff responded with an angry letter dated November 21, 1994. In

27. On November 7, 1994, Paicos wrote to the EOCD on behalf of the Town, noting that the Selectmen had approved the amended regulatory agreement, but, "[i]n so doing, the Board has voted to insert in the [amended agreement] language, at the end of item 7, the words, 'and the Board of Selectmen.'" Defs.' Ex. J. This change would have expressly provided for the Board's approval of all future changes. The record does not show any reply from the EOCD or from Welch, who had previously "indicated he would never sign such a document." Paicos Dep. at 933. The Massachusetts Appeals Court, which also examined this agreement, noted:

> The amendment was executed by the plaintiff and the EOCD but was never executed by the selectmen. No party has argued that we should, in the absence of the selectmens' [sic] signatures, conclude that this First

> Modification is invalid, and therefore we do not consider the issue.

*Welch v. EOCD* at 6 n. 7. We follow the Appeals Court. Furthermore, because EOCD policy would require renewed evidence of local support for all substantial changes to LIP projects, the Selectmen's proposed change would affect only those situations where the EOCD determined that a proposed change was insubstantial. As the record makes clear, this case does not fit those facts. Any controversy over the Selectmen's proposed change is thus immaterial.

24. Paicos testified that the Selectmen "did not want to have an informal discussion. They wanted a formal application and based upon full disclosure of what the developer proposed to then do, it was our norm to circulate that to the departments for comment

this letter, Welch again asked for agenda time to discuss expansion of the Estates.

Also on November 21, 1994, the ZBA declined to allow the Second Modification. The ZBA found, 4–1, that this modification was equivalent to "a new project by virtue of [its] size, scope, and potential impact on the Town." Defs.' Ex. K. The ZBA ruled that plaintiff had no standing to seek a comprehensive permit for a new LIP project, whether constructive or actual, without the prior approval of the Selectmen and EOCD. The ZBA thus unanimously denied the application "on the ground of lack of jurisdiction to render a decision." *Id.*

Welch appealed to the HAC, arguing that once a comprehensive permit is issued, the ZBA "alone has the power to modify" it, and that the "EOCD's role is limited to monitoring the developer's profit margins and the level of participation in the project by low and moderate income persons." *Welch v. EOCD* at 7. On February 28, 1995, the HAC disagreed with plaintiff and affirmed the ZBA's denial; plaintiff did not seek judicial review. *See id.*

Following this decision, Welch applied for a new comprehensive permit allowing development of the 44–acre parcel adjacent to the Estates. In this filing, plaintiff sought not a modification to his existing permit, but an unrelated permit for a separate development called Chestnut Estates. The Chestnut Estates would comprise 71 units, including 13 below market, built immediately adjacent to Easton Country Estates.[25] Plaintiff filed this petition without sponsorship from the EOCD or any other subsidizing organization. On February 6, 1995, the ZBA wrote to Welch, asking for documentation showing that Chestnut Es-

tates was "fundable by a subsidizing agency under a low and moderate income housing subsidy program," as required by Mass Regs.Code tit. 760, § 31.01. The ZBA repeated this request at a hearing on February 21, 1995; when plaintiff did not produce such documentation, the ZBA continued the hearing until March 14, 1995, and again requested funding information from plaintiff. At the continued hearing, the ZBA unanimously denied the Chestnut Estates comprehensive permit for jurisdictional failures, "including the failure of the Applicant to provide a written determination of project eligibility or site approval from a subsidizing agency." Defs.' Ex. M. Plaintiff did not appeal to the HAC. *See Welch v. EOCD* at 8.

Following the demise of Chestnut Estates, plaintiff developed a new tactic. He again asked the ZBA to modify his outstanding permit for Easton Country Estates ("Third Modification"), but this time sought to add only 6 units to the 75 allowed by the First Modification, for a total of 81 units. On March 29, 1995, the ZBA approved the Third Modification. In so doing, the ZBA apparently interpreted Mass. Regs.Code tit. 760, § 31.03(2)(a)(2) (increases of more than 10% in proposed units will ordinarily be considered substantial changes to development proposals), to mean that an increase of *less* than 10% would ordinarily be considered an *insubstantial* modification, and allowed the Third Modification on that ground.

Apparently encouraged by the Third Modification's approval, on April 4, 1995, plaintiff again filed with the ZBA, seeking to add 8 new units ("Fourth Modification") for a total of 89 homes. On April 19, 1995, the ZBA allowed the Fourth Modification. In May 1995, plaintiff sought to add 5

and then following that, have some kind of a hearing. They specifically did not want to have an informal discussion which would be in the nature of circumventing a formal application.... We don't do business that way." Paicos Dep. at 361.

**25.** While the Chestnut Estates proposal contemplated more units than the Second Modification would have added to the Estates, the two development plans were substantially similar. *See Welch v. EOCD* at 7–8 (calling Chestnut Estates identical to the Second Modification); Defs.' Ex. M (describing similar street layouts).

more units ("Fifth Modification"), for a grand total of 94 units.

Meanwhile, on April 14, 1995, the EOCD inspected the Estates. By then plaintiff had built 28 units, 11 priced below market. The EOCD inspector found and reported problems in two areas. First, the below-market units were externally distinguishable from the market-rate units, in violation of LIP guidelines. Second, the house designs did not match those approved by EOCD, despite the requirement, memorialized in the EOCD's approval letter of June 3, 1993, that the "EOCD must approve any changes to the application we have just reviewed and approved." Both violations sprang from plaintiff's addition of garages, additions, and fireplaces to some market-rate, but no below-market, homes. In a letter dated May 4, 1995, the EOCD described these deficiencies and ordered plaintiff to add the extra features to "proportionate numbers" of "affordable units at no extra charge to the affordable buyer." Defs.' Ex. O. The Selectmen received a copy of this letter.

The Town received the letter on May 8, 1995; the Selectmen held a meeting that night.[26] At the meeting, Paicos informed the Selectmen not only of the EOCD's deficiency letter, but also of the ZBA's approval of the Third and Fourth Modifications. Paicos characterized these modifications as "taking advantage of ... a so-called loop hole [the 10% presumption] in the EOCD regulations" which "should be viewed as improper and should be vigorously opposed." Pl.'s Ex. 34. Paicos recommended that the Selectmen send a letter to the ZBA stating that further modifications under the 10% presumption would be "an obvious circumvention of the intent of the CMR," and vote to deny permits for the Third and Fourth Modifications. *Id.* Paicos portrayed his plan of action as a "catalyst to have the developer either ... submit the project for your approval or take his appeal to the Housing Appeals Committee [and resolve] the interpretation of the regulation." *Id.*

After some discussion, the Selectmen approved three motions: first, to send a letter to the ZBA protesting what they felt was its violation of the intent animating the 10% presumption in § 31.03; second, to deny permits and water hook-ups to units covered by the Third and Fourth Modifications, subject to review by Attorney Hamilton, Easton's Special Counsel for various matters including the Estates; and third, to authorize Hamilton to take any actions necessary to support the first two motions. All three approvals were by 4–1 votes, with Clark the sole opponent.

On May 18, 1995, Welch wrote the Selectmen to request "a meeting ... in order to hold all issues up to the light of day." There is no record of a reply to this letter. At the Selectmen's meeting of May 22, 1995, Clark moved to place the Estates on the agenda. The motion failed for lack of a second.

Despite the Selectmen's letter of protest, the ZBA approved the Fifth Modification on May 24, 1995. The ZBA had thus approved the Third, Fourth, and Fifth Modifications, all as insubstantial modifications. These approvals added 19 units to the 75 approved in the First Modification, for a total increase of 25% and a grand total of 94 units approved by the ZBA. As it approved the Fifth Modification, the ZBA warned plaintiff "that any further requested changes would be deemed substantial." *Welch v. EOCD* at 9.

Welch's next filing was much larger than the three prior modifications. On June 6, 1995, he asked the ZBA to "accept the 43 remaining proposed lots" on the Estates, which would thus total 137 units ("Sixth Modification"). Plaintiff asked the ZBA to find the Sixth Modification insubstantial; should the ZBA find it substantial, howev-

---

**26.** The record does not show whether this meeting was regularly scheduled, or specially held.

er, he agreed seek the Selectmen's approval.

At a meeting on June 21, 1995, the ZBA found that the Sixth Modification was indeed substantial, and scheduled for July 19, 1995 the hearing required by Mass Regs.Code tit. 760, § 31.03(3)(c). In a letter dated June 26, 1995, plaintiff informed the Selectmen of this action, and relayed that the ZBA had "requested that I bring this proposed modification before the Board of Selectmen for their endorsement." Pl.'s Ex. 40. Welch then requested that the Selectmen schedule a hearing on the Sixth Modification. *See id.* The Selectmen asked Special Counsel Hamilton for advice on how to proceed; in a letter dated July 7, 1995, he noted that there was no explicit legal authority on the two questions crucial to the Selectmen: first, under what standard should they review a proposed modification to a LIP project, and second, whether Welch could proceed to the ZBA without the their approval. Hamilton recommended a "conservative approach" to the first question, under which the Selectmen would refrain from action that was "arbitrary and capricious." Pl.'s Ex. 41. He further opined that Welch's failure to obtain the Selectmen's approval would render any proposed changes ineligible for LIP status. *Id.*

Also on July 7, 1995, the EOCD wrote to plaintiff,[27] informing him that "its approval of the nineteen new units was required under the LIP program, notwithstanding the [ZBA's] action on his comprehensive permit." *Welch v. EOCD* at 9. The EOCD also informed plaintiff that it would not approve the new units unless Welch had the support of the Selectmen. *See id.* This letter essentially echoed the EOCD's letter of March 23, 1994.[28]

On July 12, 1995, the ZBA voted "to formally request that the Board of Selectmen schedule a public hearing on the 43 unit substantial change at it's [sic] earliest possible convenience." Five days later, in a letter dated July 17, 1995, the ZBA conveyed this request to the Board of Selectmen. The Selectmen scheduled a discussion for July 24, 1995. In a preparatory memo dated July 21, 1995, Paicos suggested information the Selectmen might ask plaintiff to submit, and might include in consideration of his development.[29] Paicos also recommended that the Selectmen consider what standard of review to use in making that decision, referring to Hamilton's letter of July 7, 1995. Finally, Paicos suggested that "the entire lottery process conducted on the first part of the project be reviewed."[30]

**27.** This letter is not on the record. We therefore depend on other sources, primarily the summary in *Welch v. EOCD.*

**28.** *See supra* page 149. Finally, the EOCD noted that because it considered the 19 units "to be a substantial change requiring the endorsement of the Board of Selectmen, it is not necessary to address the town's position that because the Board of Selectmen was the applicant on the original LIP application, the board should be the originator of amendments even if insubstantial." Paicos Dep. at 747 (counsel reading letter); *see supra* page 150–51 n. 23.

**29.** Briefly summarized, this information was: a plan showing the current project and the proposed project; detailed financial information; analysis into the development's effects on traffic, ground water, water distribution, school population, and other Town services;

the developer's experience and compliance with other regulations; and a site inspection.

Clark testified that this memorandum contemplated receiving more information than required by the ZBA, although the Selectmen had approved the First Modification after reviewing only the information required by the ZBA. *See* Clark Dep. at 198–99. He further testified that Paicos' memorandum, if adopted, would demand information "far outside that of a comprehensive permit .... the whole point of a comprehensive permit is to bypass those standards." *Id.* at 205. Finally, Clark testified to his belief that at least one of Paicos' recommended avenues of further information was intended "[t]o slow the project down, to make the project not as cost effective." *Id.* at 209.

**30.** Pl's Ex. 59. Paicos may have been referring to allegations that plaintiff or his agents re-ran the lottery under altered conditions in

At the meeting, Hardin noted that the Selectmen would not have "a discussion regarding the merits of the project, just the procedure to be followed."[31] Paicos suggested that the Selectmen consider two questions: what materials the Town should require in LIP applications, and whether plaintiff's application should be for 43 or 62 units.

Shortly thereafter, plaintiff again sought relief from the Massachusetts courts. On August 16, 1995, he amended his complaint before the Bristol Superior Court in *Welch v. Paicos*, No. C94–00504.[32] In this complaint, plaintiff contended that only the ZBA had authority to modify the comprehensive permit governing his development, that its approval of the Third, Fourth, and Fifth Modifications was therefore valid, and that the Town could not stop him from building the 19 units described by those modifications. Welch sought an injunction allowing construction of these units, as well as judicial explication of the procedure needed to modify his comprehensive permit. The court declined Welch's motion for a preliminary injunction against the Town. Both sides moved for summary judgment.

On August 23, 1995, in a letter from Special Counsel Hamilton to plaintiff's counsel Drucker, the Selectmen set forth their position on Welch's claims. The letter read, in part:

> Mr. Welch has requested that the [Selectmen] review a proposed modification to the Project which would add 43 units [the Sixth Modification]. Mr. Welch also seeks to modify the project by adding 19 additional units [the Third, Fourth, and Fifth Modifications]. Mr. Welch has indicated that he does not wish that the [Selectmen] review the proposal to modify the Project by adding the 19 units and only review the addition of the 43 units.
>
> . . . . .
>
> It is the [Selectmen's] position that if Mr. Welch intends to modify the Project by adding not only the 43 lots of the Project but also the additional 19 units, all 62 proposed units must be reviewed simultaneously in order to determine the impact of these proposed changes to the Project. . . . If Mr. Welch is prepared to have all 62 proposed units reviewed simultaneously . . . the matter may proceed.
>
> If Mr. Welch wishes the [Selectmen] to review only the proposal to add 43 units to the Project, it must be accompanied by Mr. Welch's withdrawal of his proposal to add the 19 units to the Project. . . . The withdrawal would also require the dismissal of the pending action in Bristol Superior Court and the surrender of the approval by the Zoning Board of Appeals of the change[s] to the comprehensive permit for the proposed 19 units. It must also be accompanied by a plan showing the modified Project with only the 43 units remaining, and any remaining undeveloped area and how it relates to the Project as previously approved by the [Selectmen].

Pl.'s Exs. 44, 45. On September 6, 1995, plaintiff responded by writing that, "[w]ithout waiving any rights, I am prepared to have all 62 proposed units reviewed simultaneously." On October 3, 1995, plaintiff followed up with another letter asking after the status of his prior letter.

Presumably reacting to these letters, the Selectmen asked Attorney Hamilton

---

**31.** Clark Dep. at 237. While the meeting apparently took place in open session, *see* Paicos Dep. at 506, its minutes are not on this record. Plaintiff's counsel read portions of these minutes during Clark's deposition.

**32.** *See supra* page 149–50. The amended complaint added the EOCD as a defendant.

---

order to increase their chances of obtaining a certain result. *See* Sean P. Murphy, *It Took More Than Luck to Win Homebuyer's Lottery in Easton*, Boston Globe, July 19, 1999, at A1. Such allegations are immaterial to this phase of the litigation.

whether plaintiff was, based on his acquiescence to review of all 62 proposed units, required to dismiss his pending litigation and surrender his ZBA approvals of the 19 units. In a letter dated October 25, 1995, Hamilton replied in the negative, explaining that his letter of August 23, 1995 offered plaintiff two options: he could submit all 62 units for the Selectmen's review, or submit 43 units and renounce the ZBA's approval of the other 19. Plaintiff had chosen the first option, Hamilton explained:

> Mr. Welch has elected to have all 62 proposed units reviewed simultaneously by the [Selectmen]. He has not waived his rights to contend that the [Selectmen have] no authority to review the 19 units, and is proceeding with that claim in Bristol Superior Court. However, the Selectmen should proceed in due course with their review of the proposed changes.

Pl.'s Ex. 47. The Selectmen informed plaintiff that they would discuss the Estates on December 1, 1995. This discussion did not take place. On December 12, plaintiff again wrote the Selectmen to inquire after the status of his request.

On December 15, 1995, the Bristol Superior Court held oral argument on the parties' summary judgment motions. After the hearing, the court denied Welch's motion in a brief endorsement order. *Welch v. Paicos*, No. 94–00504 (Super.Ct. Dec. 15, 1995) (Brady, J.). The court took the Town's motion under advisement.

Three days later, in a letter dated December 18, 1995, the Selectmen (through Hamilton) informed Welch (through Drucker) that:

> a hearing this month is not possible due to other business .... In addition, we have now held a hearing before Judge Brady on the cross motions for summary judgment in the suit filed by Mr. Welch in Bristol Superior Court. I anticipate that, based upon my prior experiences with Judge Brady, he will issue a decision on the case within the next four to six weeks. It is the Selectmen's view that having the benefit of Judge Brady's decision in the case will assist both the Selectmen and Mr. Welch in going forward on a review of the proposed modifications to the Project. If a decision from Judge Brady is not forthcoming by January, the Selectmen will reconsider whether they should go forward with a hearing without the Superior Court's ruling.

Pl.'s Ex. 50. As Hamilton predicted, the court ruled in mid-January, holding that "[p]ursuant to the Regulatory Agreement, as amended, any modifications or changes to the Easton Country Estates Local Initiative Program project require the approval of EOCD," and granting summary judgment to the EOCD and the Selectmen. *Welch v. Paicos*, No. 94–00504 (Super Ct. Jan. 22, 1996) (Brady, J.). The court forbade Welch from proceeding with the 19 units unilaterally approved by the ZBA until the EOCD gave its approval. *See id.* On February 15, 1996, Welch appealed this ruling to the Massachusetts Appeals Court.

While his appeal was pending, plaintiff continued to seek a meeting with the Selectmen. Through counsel, the Selectmen told Welch that they would "not be in a position to address [his] proposal until after the completion of the Town Meeting," which would commence on April 8, 1996. The Town Meeting apparently took place on schedule, but the Selectmen did not subsequently contact plaintiff. On May 16, 1996, plaintiff's counsel wrote to Hamilton,[33] noting that he had heard nothing from the Selectmen since the Town Meeting, and again seeking a meeting between Welch and the Selectmen. Avery also alleged that the Selectmen's failure to meet with Welch violated his constitutional rights.

On July 8, 1996, Hamilton informed Avery that, at their regularly scheduled

---

**33.** Plaintiff was now represented by Michael Avery. *See id.*

meeting of July 15, 1996, the "Selectmen are planning to discuss the information they will need to review regarding Mr. Welch's proposal." Pl.'s Ex. 55. Hamilton's letter warned that the discussion would be "among the Board of Selectmen only and it is not anticipated that the Board will be seeking or allowing any public comment from Mr. Welch or any other individuals at this time." *Id.* Indeed, this discussion apparently took place in executive session. On July 24, 1996, plaintiff wrote to the Selectmen and asked for an "open discussion" of his project. No reply to this letter is on record.

On August 4, 1996, the Selectmen again considered, apparently in open session, what information to require on LIP applications. Plaintiff was not present. Paicos submitted a proposed list of required information that expanded upon his list of July 21, 1995.

On November 20, 1996, plaintiff filed this action. His original complaint named as defendants only Paicos and the Town of Easton. Plaintiff sought injunctive relief against Easton and Paicos in his official capacity, and damages from him individually.

Nearly three months later, through a letter from counsel dated February 5, 1997, the Selectmen sent Welch an "Application for Local Initiative Program Approval," which would "apply to the modifications Mr. Welch seeks to make to the Easton County Estates project previously approved" by the Selectmen. Pl.'s Ex. 58. The application essentially specified information the Selectmen deemed necessary to their consideration of a LIP application. It appears to be based on, but expands considerably, the discussion points listed by Paicos in his memo of July 21, 1995.[34] Plaintiff did not immediately submit an application according to this form.

Months passed in effective stalemate. The record includes no material event until September 29, 1997, when the Town of Easton closed a deal ("the transaction") with the Bay Path Corporation ("Bay Path"), involving land owned by Bay Path and abutting the Estates.[35] The transaction included four principal elements.[36] First, Bay Path divided its property, splitting off two parcels and keeping the rest undivided. The newly created parcels were Lot 1A, a ten-foot-wide strip of land where plaintiff's land touched Bay Path's ("the strip"), and Lot 1B, nineteen acres bordering the strip and including a house, barn, wetlands, and access to the road.[37]

**34.** *See supra* at 154 n. 29. Clark testified that Paicos submitted a second draft of the LIP guidelines on December 10, 1996, and that the final application was substantially similar to this second draft. Tufts agreed that Paicos, with Hamilton's help, did most of the work on this application. Hamilton testified that he "drafted a LIP application," based on Paicos' earlier memo, in September 1996. Clark testified that the Selectmen delayed finalizing the requirements for LIP applications "[t]o stalemate the [Estates] so that [plaintiff] would incur large costs." Clark Dep. at 210.

**35.** Plaintiff had considered purchasing this land. Dennis Welch testified that he and the principal of Bay Path had earlier discussed combining their properties for development, but did not recall how those discussions had concluded. Welch avers that, "[s]ometime in 1995, I invited Robert Dunn, the Town's engineer and agent of the Town's Conservation Commission, to visit Easton Country Estates for the purpose of discussing with him my

using the abutting [Bay Path] land .... I told Mr. Dunn that I anticipated buying [the land] ... for drainage purposes and also that I intended to include it in any future extensions of Easton Country Estates." Welch Aff. ¶ 22. Welch also discussed buying the land with Enzo Cardelli, who owned it before Bay Path, but took no action for reasons unknown. *See* Ribelin Dep. at 104–07.

**36.** Negotiations preceding the transaction were more complicated than the deal suggests. For example, the Town apparently had a right of first refusal over all of Bay Path's nearby property. In addition, the previous owner had redirected a stream, causing environmental damage that the Town wanted repaired.

**37.** We adopt the lot names from the survey plan that accompanied the transaction, and to which transaction documents referred. The plan identified each lot through reference to its current owner. Bay Path's property (ex-

Lot 1B was irregular in shape, wrapping around the southern border of Bay Path's remaining, undivided land.[38] Second, the Town agreed to release Lot 1B from conservation easement under Mass. Gen. Laws ch. 61A, and to waive the approximately $5,000 in back taxes it would normally collect on such release. Third, Bay Path conveyed Lot 1A to the Town. Fourth, Bay Path and the Town signed a restrictive covenant providing, in relevant part, as follows:

1. The Covenantor [Bay Path] shall not grant, cause, allow or suffer any easements, rights of way, driveways, or roadways, so as to afford access, directly or indirectly, from that parcel of land shown as Lot 1B on [the plan], to or from other land shown on said Plan as "N/F Matthew A. Welch".

2. The Covenantor shall not make, allow, or suffer any sale or other transfer of any portion of the Premises, or its entirety or interest in it, so as to afford access, directly or indirectly, from said Lot 1B to or from other land shown on said Plan as "N/F Matthew A. Welch".

3. The Covenantor shall not sell or otherwise transfer said Lot 1B, in its entirety or any portion thereof, or any

interest therein, to the owner of the said land on said Plan identified as "N/F Matthew A. Welch".

4. It is the intent of this Declaration of Restrictive Covenant to effectively prohibit any easements, rights of way, driveways, or roadways, or any sale or other transfer of any portion of said Lot 1B, or its entirety, or interest in it, so as to afford access, directly or indirectly, for the benefit of the property identified on said Plan, as "N/F Matthew A. Welch" or person owning said property identified on said Plan as "Matthew A. Welch".

Pl.'s Ex. 73.[39] The covenant was effective in perpetuity, and bound Bay Path's successors in interest, assigns, and agents. As its text reveals, the covenant prevents the unified development or common ownership of Lot 1B and the Estates. After the transaction, Bay Path could sell Lot 1B without paying back taxes and move towards developing its remaining land, the Commission held the wetlands as well as restraint over development on the south, and the Town received the covenant it sought. Plaintiff lost a possible future avenue of expansion for the Estates.[40]

---

cept for defined Lots 1A and 1B) was "N/F BAYPATH CORPORATION," Welch's land "N/F MATTHEW A. WELCH," and other lots were, for example, "N/F BERGERON" and "N/F SIEGEL." The abbreviation 'N/F' stood for 'now/formerly.' *See* Newman Dep. at 69. Wetlands were labeled "WETLANDS."

**38.** This strip, which was fifty feet wide, was apparently sought by the Conservation Commission for conservation purposes, and is not otherwise involved in this action.

**39.** Although the agreement and parties are silent on this point, we surmise that Lot 1A is the benefitted parcel, and the transfer of Lot 1A was intended primarily to make the restrictive covenant perpetually enforceable. *See Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 90, 390 N.E.2d 243 (1979) (collecting cases) ("It is essential that both the benefit and the burden of a real covenant 'touch and concern' the affected parcels of land before it will be considered to run."); *see also Garland v. Rosenshein,* 420 Mass. 319, 322 n.

4, 649 N.E.2d 756 (1995) (declining to reconsider touch-and-concern doctrine).

**40.** Plaintiff avers that, as a result of the covenant, he is "prohibited from buying or using any land to the east of Easton Country Estates for any purpose." Welch Aff. ¶ 22. Plaintiff is mistaken. The covenant prevents the owner of the Estates property (or at least a portion thereof) from buying Lot 1B, and it bars Lot 1B from development in concert with the Estates. But the covenant would not bar plaintiff from developing the Estates, selling all the lots therein, and then purchasing and developing Lot 1B as a separate subdivision.

Plaintiff has frequently noted that the covenant refers to him by name. While such statements are correct, they are not material. Since the plan accompanying the covenant identified lots by reference to their current owners, *see supra* at 157 n. 37, any mention of plaintiff's land would necessarily involve use of his name. Such a reference, however, has legal import no different than an anonymous term such as 'Lot 47.'

On December 2, 1997, the Massachusetts Appeals Court issued *Welch v. EOCD, supra* page 153, affirming the Superior Court in all respects. Dismissing plaintiff's contention that the ZBA "alone is authorized and empowered to modify his comprehensive permit," *id.* at 9, the court found that:

> Fundability is a jurisdictional fact in the comprehensive permit process .... Here, fundability, as expressed in the EOCD's letter of June 3, 1993, was for a particular project under the LIP program "consist[ing] of 76 units, 19 of which will be ... subsidized ...." That letter defined the parameters of the project for which jurisdictional approval was given for the comprehensive permit process. The [ZBA] lacked jurisdiction to consider any other project, including any modification, because the evidence (EOCD's June 3, 1993 letter, which was incorporated into plaintiff's comprehensive permit) unequivocally showed that approval extended *only* to the seventy-six unit project.

*Id.* at 12–13 (emphasis and altered quotation in original). In the alternative, the court grounded its result in the structure and purpose of the LIP regulations:

> In plaintiff's view, the [ZBA] has unlimited power to grant a modification to enlarge a comprehensive permit project beyond what the selectmen would have ever applied for. Such a result was never contemplated by the regulations .... [i]t violates the purpose of the LIP regulations, which is to encourage the chief elected officials of cities and towns to apply to the Commonwealth for assistance in constructing low and moderate income housing.... Chief elected officials could hardly be expected to take stock in a program that allows a developer to solicit their endorsement for his product, then use it to sell a different

product with no opportunity to rescind the endorsement.

*Id.* at 14. Finally, the court noted that the regulatory agreement is "an enforceable agreement" restricting Welch to a single development plan. *Id.* at 16.

Plaintiff asked the Supreme Judicial Court to review *Welch v. EOCD;* on February 20, 1998, however, the SJC denied further appellate review. *Welch v. Executive Office of Communities and Development,* 427 Mass. 1101, 692 N.E.2d 963 (1998). With that action, *Welch v. EOCD* was final, and plaintiff was stuck. He remains stuck: he cannot petition the ZBA for a comprehensive permit without EOCD backing, he cannot obtain EOCD backing without the Selectmen's approval, and the Selectmen's approval is not forthcoming. Indeed, the Selectmen have neither voted on plaintiff's application nor provided him with a hearing that he deems satisfactory.

On April 29, 1998, we allowed plaintiff to amend his complaint. The amended complaint added current and former Easton Selectmen as defendants, suing them as individuals for damages. They were Jeffrey Tufts, Patricia Hunt, William Hardin, Daniel Churchill, and Fred Clark.[41]

On June 15, 1998, plaintiff submitted an application outlined according to the Selectmen's criteria of February 5, 1997. In this application, plaintiff asked the Selectmen to approve all 62 units originally proposed in the Second Modification, and again proposed though the Third, Fourth, Fifth and Sixth Modifications. As plaintiff himself noted, several areas of the application did not strictly conform to the Selectmen's criteria. In all these areas, plaintiff noted, he submitted materials comparable to those supporting his first LIP application, which the Selectmen approved.

---

**41.** In papers opposing summary judgment, plaintiff claims that the added defendants were "sued in their individual capacities for damages and in their official capacities for injunctive relief." Pl.'s Facts ¶ 3. This asser-

tion is in error; the amended complaint names these defendants only in "their individual capacities for damages." Am. Complaint ¶ 4A.

Plaintiff concluded the application with detailed provisos:

> The Applicant's submission of this application is made solely because of the Selectmen's demand that he do so before the Selectmen will review the Applicant's proposal for the Project. By submitting this LIP application, the Applicant does not waive any objections he has to the Selectmen's authority to require him to respond to the criteria set forth in the LIP application as promulgated by the Selectmen. The Applicant also reserves any and all of his rights to challenge the Selectmen's requirement that he submit this application before the Project is considered for approval or that he provide all of the information listed in the Selectmen's [criteria].

Pl.'s Ex. 60. Finally, plaintiff reserved his claims already pending in this action. *See id.*

The Selectmen scheduled a special meeting to consider plaintiff's application for August 31, 1998. According to Paicos' preparatory memorandum, the meeting was *"strictly* to review the adequacy of the application, *not* to discuss the merits of the filing." Pl.'s Ex. 61 (emphasis in original). Welch attended, with his attorneys. The minutes of this meeting are not on record. Following the meeting, the Selectmen informed plaintiff that they would send "a letter specifying the additional information [concerning the application] sought by the Board." Pl.'s Ex. 62. When no letter arrived by September 30, 1998, plaintiff inquired, through counsel, after this letter's status.

On October 16, 1998, the Selectmen responded through a letter from Attorney Hamilton. The letter waived two of the LIP application's requirements, declined to waive two more and promised to send more information on those two requirements. Finally, the letter reiterated the Selectmen's requirement that plaintiff "agree that *any* project modification shall require the approval of the Board of Selectmen." As of Paicos' deposition on No-

vember 3, 1998, the extra materials had not yet been provided; Paicos testified that the town was working on them.

There the record, although not the story, ends. Plaintiff and defendants are at an impasse on the issue central to this action; on other fronts their skirmishing continues unabated. It appears, for example, that Welch sought disclosure of legal costs the Town incurred relating to the LIP application for the Estates, and filed suit, presumably under the public-records law, when the Town refused to produce this information. Such stalemates and disputes are, of course, commonplace to politics at all levels. The situation concerns this court only if defendants abrogated the Constitution in the process.

## II. STANDARD OF REVIEW

We may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Terry v. Bayer Corp.,* 145 F.3d 28, 34 (1st Cir.1998). Thus plaintiff, the non-moving party, can thwart summary judgment by showing a genuine issue of material fact. An issue is genuine if a rational factfinder could resolve it in favor of either party, *see Allstate Ins. Co. v. Occidental Intern., Inc.,* 140 F.3d 1, 2 (1st Cir.1998). A fact is material if it could " 'sway the outcome of the litigation under the applicable law.' " *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997) (quoting *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995)).

In opposing summary judgment, however, the non-moving party " 'may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts' " showing a genuine issue of material fact. *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 158 (1st Cir.

1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (alteration in original)). This evidence " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Cadle Co.*, 116 F.3d at 960 (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)).

These rules serve only to ensure the correct resolution of a simple question: whether " 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir.1998) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). If a reasonable jury could examine the evidence before us and find for the nonmoving party, we must deny summary judgment.

### III. PLAINTIFF'S CLAIMS

■ This action arises under 42 U.S.C. § 1983.[42] As the Supreme Court has "said many times, § 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Thus, to prevail on a § 1983 claim, plaintiff must establish two elements: that conduct (1) under color of state law has (2) deprived him of rights secured by the Constitution or Federal law. *See Soto v. Flores*, 103 F.3d 1056, 1061–62 (1st Cir.), *cert. denied*, 522 U.S. 819, 118 S.Ct. 71, 139 L.Ed.2d 32 (1997). Plaintiff alleges that defendants violated four of his Constitutional rights; to petition the government for redress of grievances under the First and Fourteenth Amendments (Count I); to investigate the qualifications of public officials under the First and Fourteenth Amendments, and to be free of retaliation against such investigation (Count II); and to be free of procedural (Count III) and substantive (Count IV) violations of the Due Process Clause of the Fourteenth Amendment. Plaintiff seeks legal and equitable relief, as well as litigation costs and attorneys' fees.

To resolve three of plaintiff's claims—those concerning his right to petition and to procedural and substantive due process—we need consider only objective evidence. These claims are based on defendants' actions, not on the motivations underlying them. Plaintiff's fourth claim, alleging retaliation against protected expression, presents markedly different issues. To resolve it, we must determine not whether defendants' actions were objectively unlawful, but whether they were motivated by improper animus. In other words, this claim inherently centers on subjective evidence. We consider first the objective, and then the subjective, claims.

### A. Right to Petition for Redress (Count I)

The Constitution guarantees "the right of the people peaceably ... to petition the Government for a redress of grievances." U.S. Const. amend. I. Through the Fourteenth Amendment, this provision applies to the States. *See Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). Plaintiff's amended complaint alleges that:

[Defendants] have repeatedly taken the position, including in litigation in the state Superior Court, that Welch requires the approval of the Selectmen to go forward with the modifications approved by the ZBA .... At the same

---

42. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...." 42 U.S.C. § 1983 (West 1994 & Supp.1999).

time, Paicos and the Selectmen have repeatedly refused to grant Welch a hearing to seek such approval.

Am. Complaint ¶ 45. Thus, plaintiff concludes, defendants have denied his constitutional right to petition "by refusing to grant him a meeting to discuss the grounds for his proposed modifications to the Comprehensive Permit and to petition the government for redress of grievances." *Id.* ¶ 46.

■ Plaintiff readily acknowledges that the Selectmen understood his desire to expand his development, and received his multiple requests for a meeting. Neither the form of these communications nor the results they have produced are to plaintiff's liking; nevertheless he has, in some fashion, already petitioned for redress. Thus, he argues in essence for a constitutional right to plead his case on terms of his choosing. That is not the law. To the contrary, the Supreme Court has held that "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 283, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). As the Court noted in *Minnesota State Board:*

> Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted. Legislatures throughout the nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received from only a select group. Executive agencies likewise make policy decisions of widespread application without permitting unrestricted public testimony. Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices.... Government makes so many policy decisions affecting so many people that it would likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard.

*Id.* at 284–85, 104 S.Ct. 1058. After examining both policy and precedent, the Court found that "[n]othing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Id.* at 285, 104 S.Ct. 1058; *see also Bi–Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (denying similar claim made under Due Process Clause); *cf. North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 717–18 (4th Cir.) (upholding state law barring lobbyists from making campaign contributions against petition-for-redress claim), *cert. filed*, 67 U.S.L.W. 3733 (U.S. May 18, 1999) (No. 98–1887).

■ Under these cases, plaintiff has no constitutional right to a hearing before, a meeting with, or even a response from the Board of Selectmen. While some commentators have argued for a broader interpretation of the right to petition,[43] we are immutably bound by applicable Supreme Court precedent. *See State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 284, 139 L.Ed.2d 199 (1997). Should plaintiff wish to reverse these precedents, he must do so in the appropriate forum.

---

43. *See, e.g.,* Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth,* 21 Hastings Const. L.Q. 15 (1993); Stephen A. Higginson, Note, *A Short History of the Right to Petition Government for the Redress of Grievances,* 96 Yale L.J. 142 (1986).

## B. Due Process

Plaintiff also alleges that defendants violated his Fourteenth Amendment rights to procedural and substantive due process. While these doctrines rise from a single clause in a single amendment and guard against related wrongs, they differ in both purpose and application. Procedural due process guarantees, through oversight of the process employed, that state actors cannot unfairly trench on private interests. Substantive due process guards against state action so unsound that no procedural protection could cure its constitutional deficiency. *See Licari v. Ferruzzi,* 22 F.3d 344, 347 (1st Cir.1994) (citing *Amsden v. Moran,* 904 F.2d 748, 753–54 (1st Cir. 1990)). We separately consider each of these doctrines.

### 1. *Procedural Due Process (Count III)*

■ To survive summary judgment on his procedural due process claim, plaintiff must allege evidence sufficient to establish four elements: that defendants, (1) acting under color of state law, (2) deprived plaintiff of (3) a property interest, as defined by state law, (4) without satisfactory process. *See PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 30 (1st Cir.1991).

Plaintiff prevails on the first element, easily alleging that defendants acted under color of state law. He challenges overtly official acts taken by the Selectmen, and memorialized in their minutes and on their letterhead. Defendants do not contest this point, and we consider it no further.

To prevail on the second and third elements, plaintiff faces a more difficult challenge: he must identify a property right under Massachusetts law, and describe how defendants' actions (or their lack thereof) deprived him of it. Plaintiff's task

is particularly onerous because the Selectmen never approved any expansion beyond the First Modification, thus making plaintiff, in his own words, a "mere applicant" for LIP approval.[44] While courts often grant procedural due process protection to permit holders, claims by applicants are more likely to fail. *See Medina v. Rudman,* 545 F.2d 244, 250 (1st Cir.1976). Because the Supreme Court has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause," *Lyng v. Payne,* 476 U.S. 926, 942, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) (citing *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985)), we turn to cases from the Court of Appeals.

Plaintiff depends on *Raper v. Lucey,* 488 F.2d 748 (1st Cir.1973). In *Raper,* the court reversed the dismissal, for failure to state an actionable claim, of an action challenging Massachusetts' method of granting or denying motor-vehicle licenses. Over a period of ten years, plaintiff Raper repeatedly applied for a driver's license; Massachusetts invariably turned his applications down, although without explaining why it did so. The court found that Raper had "a constitutionally protected right to procedural due process in the state application procedures whereby a determination of whether to issue such a license will be made." *Id.* at 751. Under *Raper,* plaintiff argues, he is protected by the due process clause. His argument proceeds as follows: *Raper* granted an applicant due process protection; plaintiff, an applicant, must have rights equal to those of the applicant in *Raper;* thus, plaintiff is fully protected by the doctrine of procedural

---

**44.** Pl.'s Mem. at 14 (emphasis omitted). In the alternative, plaintiff argues that his existing comprehensive permit, and the EHP's approval of various proposed modifications, give him rights greater than an applicant's. *See id.* at 14–15. To make this argument, however, plaintiff must ignore repeated provisos to various LIP documents, which unambiguous-

ly stated that any modifications to his project could proceed only with clearance from the Town and the EOCD. These conditions made it utterly clear that plaintiff's comprehensive permit, while allowing the Estates as initially agreed, conferred no special right to expand or otherwise modify the development.

due process. Unstated in plaintiff's reasoning, but necessary to its logic, is the interim conclusion that *Raper* conferred due process protection not merely on Raper or those like him, but on all applicants for any permit.

Unfortunately for plaintiff, neither *Raper* nor the subsequent case law supports the reading he proposes. *Raper* itself does not apply to plaintiff's claim. The Fourteenth Amendment protects "life, liberty, and property" from deprivation "without due process of law." *Raper* involved a "protectable liberty," not a property right. *Id.* at 752. Since a previous First Circuit case had extended "the personal liberty provision of the due process clause ... to cover the use of a motor vehicle," the *Raper* court held, due process protection should apply to "comparable license application proceedings" as well. *Id.* at 752 (discussing *Wall v. King*, 206 F.2d 878 (1st Cir.1953)). In other words, the applicant in *Raper* prevailed because the Court of Appeals recognized a previously established due process right " 'to make use of one's own property, here a motor vehicle, as a means of getting about from place to place.' " *Raper*, 488 F.2d at 748 (quoting *Wall*, 206 F.2d at 882). The courts have not recognized a similar right to develop one's own property as one pleases; indeed, they have reached the opposite result. *See, e.g., Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (upholding comprehensive zoning ordinance against due process challenge). *Raper* does not control this case.

Since *Raper*, the First Circuit has spoken further on when applicants are entitled to procedural due process. In *Medina v. Rudman*, 545 F.2d 244 (1st Cir.1976), the court affirmed dismissal of a due process claim after New Hampshire failed to approve plaintiff Medina's purchase of stock in a greyhound-racing track. The court found that Medina had no cognizable property right, because decisions of the state racing commission were explicitly discretionary, and thus the general populace was not entitled, on set terms, to a racing license. *See id.* at 251. In so deciding, the court discussed which applicants should receive procedural due process protection, and how *Raper* fit into this reasoning:

> A state-recognized interest might also exist if the New Hampshire racing law could be said to confer upon Mrs. Medina a right, upon equal terms with others generally, to be licensed so as to engage in a common activity or pursuit.... [I]t seems likely that when a state holds out a right to citizens to engage in an activity on equal terms with others, a state-recognized status exists. The case of *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957), finding a right of due process with respect to bar admissions, can be explained on such a ground (as well as on the ground that the right to pursue an ordinary occupation is, by itself, a "fundamental" liberty interest). This circuit has held that obtaining a driver's license is subject to due process protection, and the same has been held in another circuit with respect to a radio operator's license. In these cases, the government recognized an entitlement in favor of all persons, or of a class, upon terms and conditions of general application.

*Medina*, 545 F.2d at 250–51 (citations omitted). Following *Medina*, courts of this circuit have declined to find property interests vested in applicants for discretionary permits. *See, e.g., Chongris v. Board of Appeals of Andover*, 811 F.2d 36, 43–44 (1st Cir.1987); *Grendel's Den, Inc. v. Goodwin*, 662 F.2d 88, 90 n. 4 (1st Cir.), *rev'd on other grounds*, 662 F.2d 102 (1st Cir.1981) (en banc), *aff'd*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); *O'Neill v. Town of Nantucket*, 545 F.Supp. 449, 452 (D.Mass.1982), *aff'd*, 711 F.2d 469 (1st Cir.1983).

We will therefore find a property interest in an applicant such as plaintiff

only if the benefit, license, or program for which he applies is routinely granted to all applicants meeting objective or easily judged criteria.[45] When a license is discretionary, however, or is conditioned on the weighing and comparison of complex or subjective criteria, a property interest cannot attach until after the license is granted. We must therefore determine whether plaintiff has claimed a property right sufficiently general and non-discretionary to qualify applicants for due process protection.

He has not. We discern from plaintiff's brief three claimed property rights: to a hearing itself, to a modification of his comprehensive permit, and to an inchoate right to prevent the Town from blocking, through the Bay Path transaction and covenant, his expansion of the Estates. None of these claims have merit.

■ Plaintiff cannot contend that he has been denied a hearing, itself a process, without due process. While plaintiff's property right to a hearing is doubtful for the reasons just stated, we do not reach this question; this claim is properly analyzed not under the Fourteenth Amendment, but under the First Amendment's protection of the right to petition for redress. Both precedent and logic compel our decision. In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that excessive-force claims under § 1983 must be decided not under a generic substantive due process standard, but by applying the applicable specific constitutional provision, most likely the Fourth or Eighth Amendment. *See id.* at 394, 109 S.Ct. 1865. The Court subsequently broadened its view of this decision, to hold that "if a constitutional claim is covered by a specific constitutional pro-

vision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *see also Conn v. Gabbert*, 526 U.S. 286, ——, 119 S.Ct. 1292, 1296, 143 L.Ed.2d 399 (1999); *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714–15, 140 L.Ed.2d 1043 (1998). While the Court spoke of substantive, not procedural, due process, the *Lanier* logic applies in this context as well, and represents a more general trend. As the First Circuit has noted, "recent decisions suggest that when faced with multiple, potentially relevant constitutional provisions, courts should invoke the provision that treats most directly the right asserted." *Parella v. Retirement Bd. of Rhode Island Employees' Retirement System*, 173 F.3d 46, 58 (1st Cir.1999). Having just considered plaintiff's right to petition for redress, it would be nonsensical to reconsider the denial of a hearing under due process precedents. A separate constitutional provision already protects the disputed right; the Constitution does not require needless duplication of effort.[46]

■ Plaintiff's second possible claim, to a modification of his comprehensive permit, also fails. Since the Selectmen's approval of a LIP development is not routinely granted "on terms and conditions of general application," *supra*, plaintiff cannot claim a property interest while applying for that approval. While the Massachusetts courts have not considered how much discretion a municipality may exercise in granting or withholding approval of LIP projects, the agency interpretation indicates that this discretion is broad. Although local approval is a "minimum re-

---

**45.** A benefit granted under 'easily judged criteria' might include an annuity available only to the disabled, *see Mallette v. Arlington County Employees' Supplemental Retirement System II*, 91 F.3d 630, 637–38 (4th Cir.1996), or a rent subsidy granted only to applicants of

lesser means. *See Ressler v. Pierce*, 692 F.2d 1212, 1214–16 (9th Cir.1982).

**46.** Even under the Due Process Clause, plaintiff's claim to a hearing would likely fail. *See Bi–Metallic, supra* at 163.

quirement[ ]" for EOCD consideration of a LIP development, arid is therefore crucial to developers, the EOCD's Local Initiative Program Guidelines provide no standard for the Town's decision, saying only that the "EOCD expects local public officials to act in good faith and expects local support for housing proposed under the Local Initiative Program not to be unreasonably withheld." From this hortatory language, one could infer that the Selectmen's discretion was total or nearly so. Even without this inference, however, the Selectmen's decision is clearly distant from Massachusetts' in *Raper*, and much closer to New Hampshire's in *Medina*. Land-use planning is frequently marked by the clashing of competing interests; the need for local officials to balance these interests, and to consider mandates from the state and federal governments, effectively precludes the habitual granting of LIP approvals that could imbue applicants for them with a due process property interest.

■ Finally, we dismiss with ease any procedural due process claim concerning the Bay Path transaction, ten-foot strip, or restrictive covenant. Plaintiff sites no authority supporting a claimed right to prevent the Town from purchasing land abutting his, whether in a buildable lot or a ten-foot strip. Indeed, a citizen cannot stop the government from seizing his own land; he can only insist on a fair price. *See* U.S. Const. amend. V. Nor has plaintiff argued that the greater does not include the lesser, and that the covenant trenches on a property right where a straight purchase would not. The transaction and strip implicate no due process property right.

Without a property right, plaintiff's procedural due process claim must fail. We therefore do not reach the question of whether the process itself was adequate under the Constitution.

2. *Substantive Due Process (Count IV)*

■ Welch also contends that defendants violated his substantive right to due process. The doctrine of substantive due process forbids state action that would offend the Constitution regardless of the procedure regulating it. *See Amsden v. Moran*, 904 F.2d 748, 753–54 (1st Cir. 1990). As our Court of Appeals explained, such claims fall into two categories. When a plaintiff can "demonstrate a violation of an identified liberty or property interest protected by the [substantive] due process clause," his claim is resolved under substantive due process precedents concerning that interest. *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991).[47] When a plaintiff cannot claim such a specific protected interest, as Welch has not here, he can demonstrate a violation of the substantive due process clause only by showing state action that "shocks the conscience" or "offend[s] the community's sense of fair play and decency." *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *see also Pittsley*, 927 F.2d at 6–7.[48] Plaintiff may not, however, commingle contested events with other factors to establish a substantive due process claim; instead, "state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking." *Amsden*, 904 F.2d at 754 (emphasis in original); *see also Licari*, 22 F.3d at 347 (quoting *Amsden* ).

In the rough-and-tumble politics of land-use planning, very little can shock the constitutional conscience. Because of the strong and varied interests involved in local permitting and zoning, as well as the manifold factors and laws implicated by development disputes, a planning board's discretion is frequently an important fac-

---

**47.** In recent years, the Supreme Court has curtailed the expansion of this prong of substantive due process law, preferring to rely on cases decided under specific constitutional provisions. *Cf. supra* at 165–66.

**48.** Thus, when alleging state action that shocks the conscience, plaintiff need not establish a protected property interest. *See Pittsley*, 927 F.2d at 6.

tor, if not the deciding one, in its decision. This discretion is essentially unreviewable in court. *See Gulf Oil Corp. v. Board of Appeals of Framingham*, 355 Mass. 275, 277–78, 244 N.E.2d 311 (1969). As a result, developers challenging adverse decisions must contest their legality:

> *Every* appeal by a disappointed developer from an adverse ruling by a local Massachusetts planning board necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as "due process" or "equal protection."

*Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.1982) (emphasis in original). Even when a planning board abuses its discretion, or disobeys state law in some other manner, the federal courts will not automatically find a due process violation. *See PFZ Properties*, 928 F.2d at 31–32; *Amsden*, 904 F.2d at 757 (bad-faith violation of state law does not necessarily violate due process).[49]

Applying these principles, the First Circuit has "'repeatedly held ... that rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process.'" *Licari*, 22 F.3d at 349 (quoting *PFZ Properties*, 928 F.2d at 31) (alteration in original). Although the "door [remains] slightly ajar for federal relief in truly horrendous situations," *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992), when a plaintiff seeks to show a

substantive due process violation in land-use planning, "the threshold for establishing the requisite abuse of government power is a high one indeed." *Id.* (internal quotation marks omitted).

Developers in our circuit have consistently failed to clear this high bar. *See Licari*, 22 F.3d at 349–50 (no violation of substantive due process where building inspector revoked permits and developer defaulted on construction loan during delay in processing its application for amended permit); *Nestor Colon*, 964 F.2d at 45–47 (same where developer alleged that planning board retaliated against its principal's political views, notwithstanding ruling in the same opinion that First Amendment retaliation claim should proceed to further discovery); *PFZ Properties*, 928 F.2d at 31–32 (same where permitting authority granted general approval of the project but withheld endorsement of construction drawings for four years and later rescinded original grant of overall approval); *Chongris v. Board of Appeals of Andover*, 811 F.2d 36, 42–43 (1st Cir.1987) (same where local ZBA illegally gave standing to neighborhood association and, acting on association's petition, reversed building inspector's prior grant of permit);[50] *Chiplin Enterprises. v. City of Lebanon*, 712 F.2d 1524, 1527–28 (1st Cir.1983) (same where planning board, acting in bad faith, exceeded its authority in denying plaintiff's application, resulting in five-year delay while plaintiff litigated and prevailed in state court); *Creative Environments*, 680 F.2d at 831–34 (same where developer alleged that planning board distorted its interpretations of state law and a state court opin-

---

**49.** To review a LIP application, the Selectmen do not strictly sit as a planning board. Plaintiff does not raise this issue. Regardless, the First Circuit cases we discuss are not predicated on a particular procedural posture or provision of state law; instead, they confront the reality of land-use planning and the need to allow local politics to operate without undue interference.

**50.** Strong policy arguments support these precedents. The role of the federal courts "is

not and should not be to sit as a zoning board of appeals." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 13, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Marshall, J., dissenting). Close review of zoning decisions would frustrate this maxim by necessarily "insinuat[ing] the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals .... closer to the situation and better equipped to provide relief." *Nestor Colon*, 964 F.2d at 45.

ion in order to thwart construction of plaintiff's development).

To oppose this array of developer defeats, plaintiff advances only one case, *Collier v. Town of Harvard*, No. 95–11652 (D.Mass. March 28, 1997). In *Collier*, this district denied summary judgment on a substantive due process claim.[51] Plaintiff believes that his submissions have set forth "considerably more extensive" evidence of "considerably more egregious" state actions than those discussed in *Collier*. While plaintiff's evidence is certainly extensive, it does not illustrate the "truly horrendous" behavior that would itself offend the Constitution. *Nestor Colon*, 964 F.2d at 32. We can best demonstrate the contrast between *Collier* and this case by summarizing the former's facts.

Like this case, *Collier* concerned an attempt at development; the *Collier* construction, however, was considerably smaller in scale. Plaintiffs in *Collier* sought to convert their small herb house, located in an historic district of Harvard, Mass., into a larger, year-round residence. They could proceed only if the Harvard ZBA granted their application for assorted permits and variances. The ZBA was advised on such matters by the Harvard Planning Board ("HPB"). One of plaintiffs' abutters, Richard DeBoalt, not only served on the HPB, but also "openly opposed" plaintiffs' planned renovation. *Collier*, slip op. at 3. In addition, DeBoalt sought an easement over plaintiffs' property. When the HPB considered plaintiffs' application, DeBoalt attended the board's confidential discussion, although he did not vote. The HPB recommended that the ZBA deny plaintiffs' application.

Plaintiffs nevertheless proceeded before the ZBA. While the ZBA considered their petition, town officials communicated with plaintiffs in a manner that can be described as threatening. The ZBA chairman told Collier that "things would go a

lot more smoothly for [him] if [he] gave DeBoalt the easement that he wanted." *Collier*, slip op. at 5 n. 5. During a ZBA hearing, plaintiffs and their attorneys were threatened with forcible removal. Meanwhile, through his lawyers, DeBoalt pressed for the desired easement. DeBoalt's attorneys faxed Collier's counsel a draft letter declaring that DeBoalt had no objection to plaintiffs' application, attached to a memorandum noting that DeBoalt's counsel were "waiting for a copy of a draft easement from you." *Collier*, slip op. at 19. Later, on the day of a ZBA meeting, DeBoalt's counsel faxed Collier a draft easement and noted in writing that "the agreement and easement need to be finalized today because the meeting is tonight." *Collier*, slip op. at 6. That same afternoon, DeBoalt threatened to introduce unspecified evidence that would sink Collier's chances with the ZBA. Later that evening, the ZBA chairman told Collier and his attorney to meet with DeBoalt before the meeting started. After holding the hearing, the ZBA suggested in an official document that Collier "bite the bullet and accept responsibility for negotiating access accommodation" with DeBoalt. *Collier*, slip op. at 6–7.

Faced with strong pressure from the ZBA to withdraw their application, plaintiffs twice did so. After the Harvard Board of Selectmen denied their related application for a special permit, Collier and his co-plaintiff filed suit. The court dismissed plaintiffs' other charges, but denied summary judgment on their substantive due process claim. The court found that jurors could reasonably conclude that DeBoalt was motivated by personal gain, and that the ZBA was improperly influenced by DeBoalt. "In other words," the court noted in its discussion of qualified immunity, DeBoalt "is accused of extortion." *Collier*, slip op. at 24.

---

**51.** The *Collier* decision is neither published nor currently available from Lexis or Westlaw. The action settled three months after the ruling on summary judgment, which was never appealed.

Given the facts in *Collier*, it is easy to understand why the court denied summary judgment. If successful at trial, plaintiffs would have shown that DeBoalt abused his position for his own improper ends, and that other municipal officials actively abetted his endeavor. This behavior would violate Collier's right to substantive due process, no matter how we phrase the test: the situation was truly horrendous, and the alleged conduct would surely shock the conscience and offend the community's sense of fair play and decency.

■ Defendants' behavior in this action is simply not analogous to the facts described in *Collier*. On this claim, they are accused of blocking plaintiff's attempts to expand the Estates through their refusal to vote on his proposed modifications, and by obtaining a restrictive covenant over the neighboring property. Neither of these actions approaches the truly horrendous behavior that could lead a jury to agree with Welch's substantive due process claim.

■ Finally, plaintiff's allegation of unconstitutional delay must fail for two reasons. First, the governing land-use cases do not support the proposition that delay alone violates due process. *See Licari,* 22 F.3d at 349–50 (delay in processing application caused default); *PFZ Properties,* 928 F.2d at 31–32 (four-year delay followed by final disapproval); *Chiplin Enterprises,* 712 F.2d at 1526–28 (discounting possibility of damages where bad-faith refusal of permit resulted in a five-year delay ended only by a court-ordered approval). Second, we cannot reconcile with political reality the argument that delay, even protracted delay evolving into effective rejection, violates plaintiff's substantive right to due process. To do so, of course, it must meet the harsh standard outlined above; we cannot see how rejection through interminable delay can offend the community's sense of fair play and decency even as it pervades the politics of this Commonwealth and nation. *Cf. Minnesota State*

*Board* at 284–85, 104 S.Ct. 1058, quoted *supra* at 162.

## C. First Amendment (Count II)

### 1. *Retaliation Against Protected Expression*

■ Finally, plaintiff claims that the Selectmen's actions "were substantially motivated by and taken in retaliation against Welch's investigation of Paicos' background and the military leave payments he received from the town." Am. Complaint ¶ 58. This claim resounds under the Constitution's First Amendment, as applied to the states through the Fourteenth. *See Grosjean v. American Press Co.,* 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936). In considering this claim, we focus not on defendants' actions, but on the motivations underlying them. These motivations are critical because otherwise-constitutional government actions "lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms." *Ferranti v. Moran,* 618 F.2d 888, 892 (1st Cir.1980) (citing *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979)). Indeed, it is now well established, in a number of contexts and situations, that state actors may not retaliate against a citizen's exercise of his First Amendment right to free expression. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *see also, e.g., Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir. 1998); *Alameda Newspapers, Inc. v. City of Oakland,* 95 F.3d 1406, 1421 (9th Cir. 1996); *Rolf v. City of San Antonio,* 77 F.3d 823, 827 (5th Cir.1996); *Gehl Group v. Koby,* 63 F.3d 1528, 1534 (10th Cir. 1995); *Burgess v. Moore,* 39 F.3d 216, 218 (8th Cir.1994); *Crocker v. Tennessee Secondary School Athletic Ass'n,* 980 F.2d 382, 387 (6th Cir.1992); *Thomas v. Evans,* 880 F.2d 1235, 1241 (11th Cir.1989). Despite its long-standing hesitance to apply constitutional doctrines to local controversies over development, the First Circuit recognized a First Amendment retaliation claim in a land-use planning case. *Nestor*

*Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 40 (1st Cir.1992) (vacating grant of summary judgment and remanding for further discovery); *see El Dia, Inc. v. Rossello,* 165 F.3d 106, 110 (1st Cir.1999) (reaffirming this holding of *Nestor Colon* ); *Anderson v. Davila,* 125 F.3d 148, 163 (3d Cir.1997) (citing with approval this holding of *Nestor Colon* ); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994) (same); *Baker v. Coxe,* 940 F.Supp. 409, 415 (D.Mass.1996) (applying *Nestor Colon* ); *accord Cordeco Development Corp. v. Santiago Vasquez,* 539 F.2d 256, 260 (1st Cir.1976) (affirming § 1983 liability finding where state defendants denied mining permit for improper political reasons).[52]

While the legitimacy of this claim is therefore clear, the standard to apply in judging it is less settled. In an analogous although not identical case, the Supreme Court ruled that the First Amendment protected a contractor from a local government's failure to renew his contract on political grounds, and sketched the following standard on remand:

> To prevail, [plaintiff] must show that the termination of his contract was motivated by his speech on a matter of public concern, an initial showing that requires him to prove more than the mere fact that he criticized the Board members before they terminated him. If he can make that showing, the Board will have a valid defense if it can show, by a preponderance of the evidence, that, in light of their knowledge, perceptions and policies at the time of the termination, the Board members would have terminated the contract regardless of his speech.

*Board of County Commissioners v. Umbehr,* 518 U.S. 668, 685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).[53] *Nestor Colon,* although decided before *Umbehr,* used essentially this standard. There, the Court of Appeals imported from employment law the "familiar burden-shifting framework" of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Mulero–Rodriguez v. Ponte,* 98 F.3d 670, 673 (1st Cir.1996). Because the *Nestor Colon* court did not explicitly define the standard it applied, we deduce its operating principles from its discussion of the burden-shifting analysis.

■■■ Under *Nestor Colon,* a permit applicant can establish a prima facie § 1983 retaliation case by showing four elements: (1) an adverse result from a government body (2) following protected expression detrimental or opposed to that body or its decision-makers, (3) despite the applicant's qualification for an approval or other favorable result; and (4) evidence indicating retaliatory intent held by the government body or its decision-makers.[54]

**52.** Two differences separate this case from *Nestor Colon* ; neither prevents us from applying its standard. First, the facts of this action are far more detailed than those known in *Nestor Colon,* where the district court restricted discovery early in the case. *See id.* at 37. There, the Court of Appeals vacated and remanded for further discovery, to be followed by another motion for summary judgment. *See id.* at 41–42, 47. Nothing in *Nestor Colon,* however, indicates that its standard applies only to cases where little discovery has occurred. Indeed, the breadth of the opinion implies the opposite view. *Nestor Colon* controls this case; we must simply adjust, in applying its standard, for the extensive discovery in this action.

Second, *Nestor Colon* considered the denial of a permit, unlike the Selectmen's lengthy decisional delay. No party argues that this difference distinguishes *Nestor Colon* from this case. Since the retaliation claim concerns motivations rather than acts, we see no reason to impose limits on the action (or, as in this case, inaction) that can be subject to such a claim.

**53.** The *Umbehr* standard also includes the balancing test of *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Umbehr* at 685, 116 S.Ct. 2342. The *Pickering* test applies to government employment and contracting situations; it has no relevance here.

**54.** *See Nestor Colon,* 964 F.2d at 41. The *Nestor Colon* court described its examination of the fourth element as follows:

Once the plaintiff makes his prima facie case, the burden of persuasion shifts to the government defendant, which must show a legitimate, non-retaliatory reason for its decision. *See Nestor Colon* at 41 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). On this showing, the burden of persuasion returns to the plaintiff, who can survive summary judgment by raising "an arguable question of pretext." [55]

This standard avoids two potential pitfalls that other rules might create. On one hand, we cannot allow plaintiff to survive summary judgment simply because his protected expression preceded negative results. *See Umbehr,* 518 U.S. at 685, 116 S.Ct. 2342. On the other hand, we must avoid concluding that a decision is constitutionally supportable simply because it could have a permissible rationale. *Cf. Thomas,* 183 F.3d at 61. Indeed, even a government decision partly based on permissible factors must fall if materially informed by unconstitutional retaliatory animus. *See Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998); *Rolf v. City of San Antonio,* 77 F.3d 823, 827 (5th Cir.1996).

Detecting this animus is therefore crucial. The First Circuit has held that retaliation claims turn largely on defendants' state of mind, *see McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979), and that when "an inference of retaliation is warranted from the chronology of events recited," especially when combined with other evidence, summary judgment should be denied and the case should proceed. *Ferranti v. Moran,* 618 F.2d 888, 892 (1st Cir.1980). Plaintiff here, of course, cannot claim the lowered burden applied to the pro se litigants in *McDonald* and *Ferranti;* he must show more than protected activity followed by adverse results. As in those cases, however, plaintiff here depends essentially on defendants' states of mind.

> Finally, and most critically in this context, the permit was allegedly denied "despite the routine grant of similar requests as to neighboring properties in the area." This latter assertion, supported by some factual allusions, is key because it indicates the possibility of an illegal motive—that something about [plaintiff], perhaps his political views, caused him to be denied what otherwise would be routinely granted.
>
> *Id.* at 41. This language may be interpreted in two ways: first, to require evidence of differing treatment of similarly situated applicants, or second, to require evidence of an illegal motive, of which differing treatment is an example. Defendants urge us to adopt the first interpretation. While there is evidence that defendants treated Welch differently from other developers, because Welch was the only LIP applicant during the period in dispute, defendants argue that no other developers were similarly situated and Welch's claim must therefore fail. Defendants' interpretation would leave plaintiffs such as Welch, who seek to engage in an activity not usually considered by the relevant government body, without a cognizable remedy. Our Constitution, however, does not shield only those who tread the well-traveled path; indeed, the opposite is true. *See McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 356, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *cf. Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 61 (1st Cir.

1999). The second, broader reading is both just and correct.

> The broader reading, moreover, finds direct support in *Nestor Colon.* First, the language quoted above finds the granting of permits to similarly situated applicants "key because it indicates the possibility of an illegal motive," not merely in its own right. Second, in affirming the grant of summary judgment on a related claim, the court stated that "[o]nly when accompanied by other facts, *such as* that others with no different qualifications were granted a permit, is the allegation sufficiently suggestive of retaliation for First Amendment activity." *Id.* at 42 (emphasis added). The *Nestor Colon* court clearly considered this element to be broader than defendants' conception. Furthermore, the broader interpretation, unlike the narrower one, conforms to the Supreme Court's opinion in *Umbehr.* We follow these courts.

**55.** *Nestor Colon,* 964 F.2d at 41. It is not clear whether the *Nestor Colon* court intended, with these words, to depart from the First Circuit's "pretext-plus" approach in other cases using the *McDonnell Douglas* burden-shifting framework. *See Thomas v. Eastman Kodak Co.,* 183 F.3d at 56–57 (discussing "pretext-only" and "pretext-plus" interpretations in employment context). In this case, however, plaintiff would survive summary judgment under either standard.

■ Plaintiff has established facts sufficient to make his *Nestor Colon* prima facie case. While the Selectmen have not voted on most of plaintiff's proposed modifications, there is certainly a genuine issue as to whether their protracted delay amounts to a denial and therefore an adverse result.[56] As in *Nestor Colon*, this result followed protected expression adverse to the decision-makers of the relevant government body.[57] Especially given the Selectmen's approval of plaintiff's original LIP application, as well as his experience in local development, plaintiff was "qualified" to receive a favorable result: the Selectmen's approval of one or more of his proposed modifications.[58] Finally, the deposition testimony on record includes evidence of a retaliatory motive held by Paicos and the Selectmen.

Under *Nestor Colon*, the burden thus shifts to defendants, who must put forth a non-retaliatory motive for their disputed actions. Assuming this burden, defendants argue that their behavior was not animated by retaliation against protected expression, but was in response to Welch's "refusal to abide by the Town of Easton's LIP application procedure and his continuing violations of [the Act]." Defs.' Mem. at 18. To resolve this claim, we must decide whether defendants' statement accurately describes their motivation, or serves as a pretext masking their retaliatory intent. On summary judgment, of course, we need only resolve whether this question, surely one of material fact, is in genuine issue.

Despite the relative ease of the summary judgment standard, the necessity of inquiry into defendants' intent, combined with plaintiff's claims against individual Town officials, raises a difficult question: in order to allow a claim against an individual Selectman in his personal capacity, must we find retaliatory intent held by that individual, or can we examine the Selectmen as a whole, inferring from their actions a shared intent held by some or all members?[59] Clearly, when groups of officials are sued in their official capacities, we may judge them as a unit. *See, e.g., Morgan v. Hennigan*, 379 F.Supp. 410, 480–82 (D.Mass.), *aff'd*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). In the present case, however, Paicos and the Selectmen are named in their individual capacities; the "'fear of being sued and held personally liable for damages is a far cry from a suit for reinstatement or injunctive relief, which public officials face regularly in the course of performing their duties.'" *de Abadia v. Izquierdo Mora*, 792 F.2d 1187, 1189 (1st Cir.1986) (quoting *Bever v. Gilbertson*, 724 F.2d 1083, 1091 n. 4 (4th Cir.1984) (Hall, J., dissenting)). This question will not always admit of the same answer, and we do not attempt here to formulate a general rule. To the contrary,

**56.** *See Nestor Colon* at 41. We therefore need not consider whether protracted delay itself constitutes an adverse result, or whether the Selectmen's repeated refusals to meet with plaintiff can form an adverse result, or are subsumed in his petition-for-redress claim.

**57.** *See id.* The record establishes that Paicos was a decision-maker for the Town of Easton at all relevant times. Although the Selectmen and the Town Meeting technically set policy for Paicos to execute, the depositions and documentary evidence show that he held and exercised substantial influence, discretion and authority.

**58.** *Id.* Defendants have not argued that plaintiff could not qualify for such a favorable result until his application was submitted in accordance with their criteria of February 1997. A reasonable jury could almost certainly dismiss this argument, since the Selectmen approved the original Estates without reviewing an application filed under these criteria.

**59.** Defendant Paicos could present a different, and even more vexing, question. Since his role is subordinate, any inquiry into intent shared between him and the Selectmen would necessarily examine, as an initial matter, the working relationship between the Administrator and the Board. We need not tackle this question, however, because the record includes sufficient evidence, at least on summary judgment, of Paicos' own, individual retaliatory animus.

we first examine defendants as individuals; should we find defendants against whom plaintiff has lodged sufficient evidence of individual retaliatory intent, we need examine their cases no further. Only after this examination is complete, and we have a fuller picture of the facts arrayed against individual Selectmen, do we consider whether the Board as a whole shared retaliatory intent.

### a. Paicos

Defendant Paicos is central to this action. As Easton's Town Administrator, he is the Town's highest-ranking full-time employee. He has broad authority over all aspects of Town administration, answering only to the Selectmen and Town Meeting. As befits his crucial role, more testimony involves Paicos than any other defendant. Based on the evidence summarized below, a reasonable jury could find that Paicos singled out Welch for poor treatment, and that this practice sprang from retaliatory animus, not the sober desire to uphold the law depicted in defendants' papers.

We begin with evidence of animus. Dennis Welch, plaintiff's nephew and a builder for the Estates, averred as follows:

> Mr. Paicos told me that it would be an uphill battle for Matt Welch to get the permits on [his desired modifications], and that someone else other than Matt Welch would definitely have a better chance of getting those permits. In fact, he told me specifically that if I got my uncle out of the deal, I would get the permits. I know from personal observation, as evidenced by the above-described conversation, that Mr. Paicos harbors ill feelings towards my uncle and has held a grudge against him for years.

Dennis Welch Aff. ¶¶ 4–5 (internal numbering omitted). Dennis Welch further testified that Paicos treated plaintiff differently than he did other people. Dennis Welch testified that Paicos never gave an opinion on the Estates development itself, except once to note that the lots were too small.[60]

Further testimony on Paicos' animus comes from Paul E. Wollenhaupt, Easton's former Director of Public Works, now employed by another town. Wollenhaupt testified that, at a retreat for Easton officials held in the autumn of 1993, Paicos "asked that we all put our heads together and come up with some way to stop that development [the Estates]." Wollenhaupt Dep. at 15. He further testified that "the main thrust of the conversation was to stop Matt Welch," and that Paicos "wanted to stop Matt Welch from continuing this development."[61] Wollenhaupt testified to ill will between plaintiff and Paicos:

> Q: Do you have any information about [Paicos'] attitude towards Matt Welch personally?
>
> A: Not being a doctor, I can't really say. But I believe Kevin is obsessed with the man.
>
> Q: Why do you say that?
>
> A: It just over the years seemed to become a personal battle between the two of them on everything and anything. There was only one occasion that I know the two of them worked together ....
>
> .... It seemed like it was going to be a breakthrough that the two of them could actually sit down and talk, and yet the very next week the two of them were at each other's throats again.
>
> Q: Do you know what the origin of this negative relationship was?

---

**60.** Whether this testimony favors defendants (Paicos was not prejudiced against the Estates) or plaintiff (because Paicos was only motivated by prejudice against Welch) is for a jury.

**61.** *Id.* at 16. Wollenhaupt's wife worked for Welch from 1993 to 1995, including during the time of the retreat. Any credibility issue posed by this link is not relevant on summary judgment.

A: No. I would say it started before I came to town [in November 1990].

Wollenhaupt Dep. at 26–27; *see id.* at 6. Wollenhaupt's testimony does not clearly benefit either side in this action. It describes personal animus by Paicos against Welch, contradicting Paicos' portrayal. At the same time, Wollenhaupt portrays the animus as entirely preceding the events of this case, militating against plaintiff's claim that Paicos retaliated against his investigation.

In similarly double-edged words, Wollenhaupt testified to hearing rumors that "Mr. Paicos was very much upset with the project [the Estates]. I believe the feeling was that Mr. Welch was trying to push something down the town's throat and was trying to go around the town's rules and regulations, and Mr. Paicos was not going to allow that to happen." *Id.* at 22. Again, this testimony points to animus motivated not by retaliation, but by disdain for plaintiff's development tactics.

Perhaps the most extensive testimony about Paicos, although not necessarily the most damaging, comes from defendant Fred Clark. Clark's voluminous deposition testimony often discussed or touched on Paicos. For example, Clark testified that Paicos led the effort to hire Attorney Hamilton as Special Counsel, because Paicos wanted an attorney who would work against construction of the Estates. Clark further testified to his opinion that Paicos was biased against Welch. In response to questions from plaintiff's counsel, Clark explained his views about Paicos' attitude toward Welch:

Q: Does Kevin Paicos have hard feelings regarding the investigations that have been conducted by Mr. Welch?

A: I believe so. I think that's what touched all of this off in the first place.

Q: Do you believe that Mr. Paicos has a desire not to assist Mr. Welch in this project?

A: I do.

Q: Do you have a belief that Mr. Paicos desires to torpedo this project?

A: Definitely.

Q: Is "torpedo" a word that you would use to describe what Mr. Paicos is doing to this project?

A: I've used that word.

Q: Do you think he's tried to hinder the project?

A: Yes.

Q: Do you think he's tried to delay the project?

A: Absolutely.

Q: Do you think he's tried to make the process more time-consuming?

A: Yes.

Q: Burdensome?

A: And expensive.

Clark Dep. at 307–08 (objections omitted). As defendants noted in a separate motion, Clark's testimony is often equivocal and sometimes speculative. For example:

Q: And is it your testimony that Mr. Paicos has had some involvement in hindering Mr. Welch's ability to get before the Board of Selectmen?

A: I have no way to document that. I surmise that.

. . . . .

Q: Do you have any information as to whether or not Kevin Paicos likes or dislikes Matt Welch?

A: Do I have any information? I have no direct information on that, but we don't converse, so how would I know? . . . .

Q: Have you ever heard Kevin Paicos speak about Mr. Welch in a disparaging way?

A: That's sort of a tough one for me to answer. I don't recall so. I know he wasn't happy at all with Matt Welch because [Welch] had spent time looking into [Paicos'] background, and he was very upset over

that. There may have been once or twice when he made comments.

Clark Dep. at 32, 69–70 (objections omitted). Similarly, when asked whether Paicos was upset by Welch's investigation into the military leave payment, Clark testified: "I can only surmise that absolutely he was upset by it." *Id.* at 107. While we agree with defendants that Clark's testimony shows serious flaws, its gaps and inconsistencies are precisely those most amenable to interpretation and resolution by a factfinder. Despite Clark's equivocation, his testimony militates against summary judgment.

Defendant Tufts testified more directly than Clark, and his testimony touched on both animus and underlying motivation. After describing his own reaction to what he called Welch's "pattern" of attacking public officials, plaintiff's counsel asked Tufts about Paicos' reaction:

Q: And Mr. Paicos has told you he doesn't like [the pattern of Welch's behavior]?

A: Yes.

Q: He's told you that on more than one occasion, right?

A: Probably, yeah.

Q: In fact, he's told you that Matt Welch investigated Mr. Paicos, right?

A: Oh, I know Matt Welch investigated him, because Matt sent the letters to me, about Mr. Paicos.

Q: And you know that Mr. Paicos didn't like that?

A: Oh, yeah, yeah.

Q: And he's told you that?

A: Oh, sure.

Tufts Dep. at 90. Tufts also testified, however, that he did not believe that Paicos intended to delay, hinder, or increase the cost of the Estates application process, and that he and Paicos never discussed any such attempts.

Paicos himself denied being upset or angry as a result of Welch's public-records requests, complaints, or lawsuits. He further denied that he intended, through recommendations to the Selectmen, to make plaintiff's application process burdensome, costly, or onerous. Finally, Paicos denied suggesting, directly or indirectly, that the Selectmen find ways to hinder, delay, or impede the Estates. Indeed, when he felt that a question from plaintiff's counsel "connote[d] an attitude of indifference or in fact hostility" on his part toward plaintiff, Paicos took pains to note that "in fact that was not the case." *See* Paicos Dep. at 365.

Instead, Paicos characterized the events leading to this litigation as follows: "Mr. Welch [was] trying to circumvent the process and we didn't let him." *Id.* at 652. Foreshadowing the defendants' memorandum of law, Paicos described the Selectmen's unwillingness to meet with Welch as the prudent course for a board facing a serious lawsuit in the Massachusetts courts:

Mr. Welch was actively pursuing his rights in court and it seemed to us … that it would be ill-advised on the town's part to meet with someone about an issue which they were denying we had any jurisdiction on to begin with and were in fact pursuing that course in court.

*Id.* at 227. Despite his disclaimer of personal reaction, Paicos also testified that he found plaintiff's investigation of Sites to be extremely distasteful, and that he considered "Mr. Welch's methods of intimidation and coercion against public officials to be repugnant to the way the process should work[,] to the proper exercise of local government and democratic society and to my own personal values." [62] Paicos testified that plaintiff's "use of someone's past mistakes in order to coerce them and intimidate them is extremely objectionable. It

---

62. *Id.* at 599. Paicos immediately followed this statement by noting that, "[b]eyond that,

I don't have much emotion vested in any consideration of Mr. Welch pro or con." *Id.*

strikes at the very heart of democracy in my opinion." *Id.* at 406.

■ Even this brief look at the evidence regarding Paicos reveals a morass of conflicting statements, shifting nuances, and differing interpretations. Our full review of the evidence on file uncovers only more of the same. We cannot determine, as a matter of law, that Paicos' motivation was not retaliatory and that defendants' proffered reason is not pretext. In short, plaintiff has adduced a genuine issue of material fact as to the motivation underlying Paicos' actions against the Estates. This issue must go to a jury.

### b. The Selectmen as Individuals

None of the individual Selectmen are as pivotal as Paicos, and there is substantially less evidence concerning them. We examine each in turn. Defendant Tufts himself testified to feelings that might conceivably indicate some form of retaliatory animus:

> A: ... the pattern that has been shown is that if someone opposed him, he would go after them in some form or manner.
>
> Q: And you don't like that?
>
> A: No, I don't like that.

Tufts Dep. at 89–90. When asked whether he was "anti-Matt Welch," however, Tufts replied: "[n]o, no, no. I voted against a project he put forth. Doesn't mean I'm against Matt Welch." *Id.* at 100.

Like Paicos, Tufts testified that the Selectmen did not, as a matter of policy, "open a hearing until [they had] the proper documents in hand." Tufts Dep. at 112; *see id.* at 109–116, 129–131. In declining to meet with Welch, Tufts explained, the Selectmen simply followed their practice of avoiding "a feel-good, touching meeting outside of a hearing .... warranted when someone submits an application." *Id.* at 130. Finally, Tufts testified that he had acted in good faith toward the Estates.

At his deposition, defendant Hardin testified that his opinion of Welch was "not at all" affected by plaintiff's investigation of Paicos' military leave. Indeed, Hardin testified, he "supported Matt Welch's project—I voted for the project. I liked the project. I like the proposed project." Hardin Dep. at 70. He also stated that he had admired plaintiff for his success, although this admiration diminished when he found problems with houses built in the Estates. Later, he reaffirmed that he considered the Estates "a great project" and his vote to approve plaintiff's original application "a great vote." *Id.* at 253. Finally, Hardin disagreed "one hundred percent" with counsel's suggestion that the Selectmen applied "a different rule for Mr. Welch." *Id.* at 179. Clark would not testify that Hardin was biased against plaintiff, calling him "somewhat of an unknown." Clark Dep. at 306.

Defendant Hunt is, in this litigation, nearly a cipher. No party submitted her deposition, if it was taken, and little mention of her appears in the evidence on file. The evidence that does appear is generally contradictory. At his deposition, Tufts testified about Hunt's state of mind:

> Q: Would you consider Patricia Hunt to have been anti-Matt Welch?
>
> A: She voted in the same terms that I did. If you want to contrive that as being against Matt Welch, I guess you could.
>
> Q: Would you consider yourself anti-Matt Welch?
>
> A: No, no, no. . . .

Tufts Dep. at 100. In contrast, Clark testified that Hunt was biased against plaintiff. Hardin, however, posited an alternative motivation for Hunt's opposition to the Estates, testifying that she was not against Welch in particular or affordable housing in general, but opposed all "development in the Town of Easton period, flat out." [63]

---

**63.** Hardin Dep. at 108–09. Because this testimony points to an explanation for defendants' behavior not posited by defendants, *see Thomas,* 183 F.3d at 61, we discount it.

If Hunt is nearly a cipher, defendant Churchill is a void. As with Hunt, his deposition is not on file; unlike in her case, we found on this record absolutely no evidence on the subject of his intent, retaliatory or otherwise.

Evidence against the individual Selectmen is, at least on this record, much scarcer than that arrayed against Paicos. Were the Selectmen considered only as individuals, this claim would proceed probably against Tufts, possibly against Hardin, doubtfully against Hunt, and almost certainly not against Churchill. We need not fully resolve these questions, however, because we find sufficient evidence of retaliatory intent held by the Selectmen as a group.

#### c. The Selectmen as a Group

 We now answer to the difficult question we previously deferred: on this record, plaintiff has presented sufficient evidence of a concerted campaign by the Board of Selectmen against plaintiff for a reasonable jury to find that the Board, as a group, singled out Welch in retaliation for his protected expression. We discuss this evidence briefly.

Defendant Clark, who opposed the other Selectmen on most issues concerning plaintiff, repeatedly testified that various decisions and actions of the Selectmen were intended purely to stall consideration of plaintiff's development. An example of this testimony follows:

Q: At this point in time, July 1996, do you believe that the Town was exercising a good faith effort to reach a decision within a reasonable amount of time with respect to Matt Welch's request for a meeting and/or a hearing on [the Estates]?

A: Absolutely not.

Q: You don't think that they were exercising good faith efforts to reach a decision within a reasonable time?

A: There was no intention.

Q: There was no intention to do so?

A: No.

Q: Why do you say that?

A: It was just one more stalling tactic .... In other words, Matt Welch was put into a special category.

Q: What special category was that?

A: To be ignored, and it would all go away.

 . . . . .

Q: So there's a different rule for Matt Welch in the Town of Easton?

A: Exactly.

Clark Dep. at 260–61, 267 (objections omitted). Similarly, Wollenhaupt testified that Welch was among the developers "given closer scrutiny than others" by the Town. The other Selectmen, not surprisingly, disagree with essentially all of these points.

Testimony from Clark, as well as from other sources, might be sufficient to send this claim to a jury. We need not, however, rely solely on deposition testimony. While the direct evidence of the Selectmen's retaliatory animus is often conjectural and contradictory, the circumstantial and documentary evidence is copious and largely uncontested. Chief among this evidence is the delay itself: despite an escalating conflict culminating in a series of lawsuits, the Selectmen consistently refused to consider plaintiff's application. In doing so, they repeatedly ignored the recommendations of their counsel. A few days after this memorandum is released, four years will have elapsed since Welch requested in writing that the Selectmen review all 62 contested expansion units, *see supra* at 155–56; the standoff began well before the letter. While a four-year delay is not unheard of, it is far from the norm; a reasonable jury could consider this delay, along with other factors listed below, to be evidence of special treatment arising from retaliatory intent.

In addition to the delay itself, the shifting explanations with which the Selectmen explained their tardiness, and through which they avoided meeting with plaintiff,

militate in favor of plaintiff's view. The list of such explanations is long: Welch's failure to submit an application (despite the absence of defined application criteria), advice of counsel while a lawsuit was pending, anticipation of an upcoming court ruling, the holiday season, preparation for an upcoming Town Meeting, plaintiff's failure to submit an application according to the Selectmen's newly promulgated application criteria, and the deficiency of that application, once submitted. Only some of these reasons jibe with defendants' non-retaliatory explanation submitted to this court. *See supra* at 172–73. The Selectmen's shifting explications of their behavior, as well as the disparity between these reasons and those in their brief, together smack of pretext, and a reasonable jury could find that pretext is involved.

Finally, plaintiff has submitted evidence indicating that defendants' treatment of him was unusual, if not unprecedented, in the Town. While there were no other LIP projects pending in Easton during the events leading up to this action, and therefore no identically situated applicants with which to compare, the record indicates that defendants responded to plaintiff differently than their norm, and understood that they were doing so. While these facts are not persuasive in themselves, they indicate that defendants considered plaintiff and his application to fall outside their routine; such evidence of special consideration supports plaintiff's allegation that he was singled out for especially adverse treatment.

Plaintiff might not prevail on circumstances alone. Such a victory would, in essence, allow something analogous to substantive due process through the back door of First Amendment retaliation law. In this case, however, plaintiff has added evidence of the Selectmen's motivation to a truly telling set of events that strongly

indicates the Selectmen's desire to conceal their true reasons behind various actions toward plaintiff. In short, although the motivations behind the Selectmen's behavior are not fully revealed, plaintiff has combined compelling circumstances with testimony on state of mind to establish a genuine issue of material fact: whether defendants singled out plaintiff for especially negative treatment in retaliation for his protected expression in investigating and criticizing defendant Paicos. On summary judgment, after all, we do not decide the merits; we decide only whether a jury will hear the merits. Plaintiff has adduced sufficient evidence to earn a full hearing before a jury.[64]

■ As a result of this ruling, we face an additional question: having found the possibility of retaliatory intent held by the Board as a whole, did individual Selectmen distinguish themselves sufficiently from the group to escape group responsibility? It seems likely that an individual Selectman, sued in his individual capacity, would nearly always receive summary judgment if he submitted evidence of his actual opposition to the actions in question. *Cf. Umbehr v. McClure*, 44 F.3d 876, 884 (10th Cir.1995) (affirming summary judgment for defendant commission member who voted against allegedly retaliatory contract termination), *aff'd*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). The only votes we have on record, however, are those taken during the Selectmen's meeting of May 8, 1995; defendants Hunt, Hardin, Tufts, and Churchill voted in favor of a series of resolutions meant to work against plaintiff; only defendant Clark opposed. Similarly, Clark testified that he was "[a]bsolutely" in favor of building the Estates, and remained "[a]bsolutely" and "definitely" in favor of the 62–unit expansion. On this record, we cannot see how Clark could have been motivated by an

---

**64.** We reach this conclusion without considering the transaction surrounding the ten-foot strip and its related covenant. We do not decide at this time whether evidence regarding the transaction is relevant to plaintiff's retaliation claim. Such evidentiary questions are appropriately resolved at, or near, trial.

improper desire to retaliate against Welch. Because Clark has not moved for summary judgment, however, this issue is not before us; indeed, there may be evidence against Clark that plaintiff did not submit. None of the moving defendants, however, can escape liability. At numerous junctures, the record clearly shows, each of them could have acted to question or oppose various actions taken by the Board. They did not, however, do so; because they did not, and because the Selectmen as a whole are liable, they must each be liable for the actions they took as a Board.

### d. The Town

■■■■ A local government can be liable under § 1983 only when "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" alleged by the suit. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As the Supreme Court recently explained, the custom and policy prongs of this test serve different purposes and have different standards:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Board of County Commissioners v. Brown,* 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citation omitted). Defendants are the highest elected and appointed officials in the Town of Easton; their actions may fairly be said to be those of the Town, and the Town may be held liable for their decisions.

Defendants attempt to avoid municipal liability by confusing the *Brown* custom and policy prongs. They argue that Welch "cannot simply cite to this present action as evidence of municipal[ ] custom or policy[,] as a single occurrence is insufficient, in and of itself, to establish" the same. Defs.' Mem. at 20. To support this proposition, defendants cite *Murray v. City of Boston,* 104 F.3d 348 [1996 WL 728171] (1st Cir.1996) (table) (per curiam) and *St. Hilaire v. City of Laconia,* 71 F.3d 20, 29 (1st Cir.1995). These cases, and many others, note that "[e]vidence of a single incident is usually insufficient to establish a custom or usage." *St. Hilaire,* 71 F.3d at 29 (internal quotation marks omitted). But these decisions and others like them concern municipal custom, not policy. They consider actions by officials below those in overall command, and seek to determine whether the pattern of these actions forms an entrenched custom of which the municipal leaders should be aware, and for which the municipality can therefore be held to account. In this action, however, the disputed actions were taken by the Town of Easton's top policymakers themselves. Policymakers, by definition, make policy, and their actions should be judged under the *Brown* policy prong.

Even under the policy prong, however, defendants' liability is not automatic. *Brown* itself held that a single hiring decision by a county sheriff, stipulated as a policymaker, could not subject the county to § 1983 liability. The facts of this case, however, are far from those in *Brown;* in this case it is clear that the municipality, as well as the individuals, took material actions. Indeed, plaintiff has submitted evidence sufficient to defeat summary judgment and indicating that the Easton Board of Selectmen and Town Administrator worked to thwart his development, and did so with improper intent. If these allegations cannot sustain municipal liability under § 1983, it is hard to imagine what events could do so. Since the actions in

question are those of the Town's top policymakers acting in their policymaking capacities, the Town cannot receive summary judgment under § 1983.

As a result of the foregoing, we conclude that plaintiff may bring to a jury his First Amendment retaliation claim against all moving defendants.

### 2. *Unconstitutional Condition*

Related to, but distinct from, plaintiff's retaliation claim is his claim of an unconstitutional condition. Plaintiff alleges that defendants unconstitutionally conditioned their grant of a hearing to his dropping his state lawsuit against them.[65] The Court of Appeals has succinctly summarized the applicable law:

> The doctrine of unconstitutional conditions bars government from arbitrarily conditioning the grant of a benefit on the surrender of a constitutional right, regardless of the fact that the government appropriately might have refused to grant the benefit at all. Not all conditions are prohibited, however; if a condition is germane—that is, if the condition is sufficiently related to the benefit—then it may validly be imposed. In the final analysis, "the legitimacy of a government proposal depends on the degree of relatedness between the condition on a benefit and the reasons why government may withhold the benefit altogether."

*National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1995) (citation omitted) (quoting Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L.Rev. 1413, 1457 (1989)); *see also Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). The conditioning of a government benefit on abandonment of litigation rights can be an unconstitutional condition. *See, e.g., Hall v. Ochs*, 817 F.2d 920, 923–924 (1st Cir.1987) (af-

firming directed verdict for plaintiff where defendant police officers and Town conditioned plaintiff's release from jail and dropping of charges against him on his waiver of right to sue).

Plaintiff, however, cannot muster facts sufficient to support this claim. His argument depends substantially on statements made, during his deposition, by defendant Paicos. Paicos testified that, had Welch dropped his state lawsuit challenging its authority, the Board would have treated him more leniently than it did. Plaintiff believes that these statements are sufficient evidence of an unconstitutional condition.

They are not. While Paicos' deposition statements may be strong evidence of retaliatory animus, they cannot support charges of unconstitutional condition. Plaintiff has submitted no evidence that he knew of Paicos' view before the latter's deposition, which took place well after *Welch v. EOCD* was final and the state legislation was over. No matter how Paicos felt at the time, defendants could not "condition[ ] the grant of a benefit on the surrender of a constitutional right," *National Amusements, supra*, without informing plaintiff of the condition itself.

Indeed, the Selectmen apparently took steps to avoid imposing an improper condition. In a letter from Special Counsel Hamilton, *see supra* at 155, the Selectmen offered Welch two choices: they could review all 62 units beyond the First Modification, including the 19 already (and improperly) approved by the ZBA; or, if Welch withdrew the 19 units and abandoned his lawsuit, they would review the 43–unit Sixth Modification. In other words, defendants refused to review plans that showed, as already approved, the 19 units whose very validity they were challenging in court. The Selectmen imposed no condition; they merely declined to acknowledge the 19 units as a fait accompli,

---

**65.** Because this claim has no merit, we need not decide whether it is subsumed by plaintiff's petition-for-redress claim.

thus potentially giving plaintiff an argument under waiver or estoppel. Such behavior is common among cautious actors and endemic among litigants. The Selectmen's position was careful, not unconstitutional. Plaintiff has alleged no genuine issue of material fact regarding defendants' use of an unconstitutional condition.

### IV. AFFIRMATIVE DEFENSES

Having denied summary judgment on the merits of one claim, we turn to defendants' affirmative defenses. None of these, however, is sufficient to bar plaintiff's First Amendment retaliation claim.

### A. Exhaustion

■■■ At oral argument, the parties discussed various exhaustion doctrines at some length. Where plaintiff did not prevail on the merits, we need not consider exhaustion arguments. On plaintiff's surviving claim, precedent is foursquare against an exhaustion defense. In deciding a First Amendment case, the Court of Appeals held that "it is firmly settled that exhaustion or resort to state remedies is not a prerequisite to a § 1983 claim." *Miller v. Town of Hull*, 878 F.2d 523, 530 (1st Cir.1989). We need go no further.

### B. Immunity

Defendants Paicos, Tufts, Hunt, Hardin, and Churchill, as sued in their individual capacities, assert the standard immunity defenses of public officials. *See* Am. Answer at 12–13. The Town itself cannot interpose any immunity defenses. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). "Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), immunity defenses are also unavailable to defendant

Paicos in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citing *Owen* ).

### 1. *Legislative Immunity*

■■■ Local legislators are absolutely immune for legislative acts. *See Bogan v. Scott–Harris*, 523 U.S. 44, 53–54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998). Defendant Selectmen argue that they are legislators, and that their actions were legislative; plaintiff disagrees on both counts. Plaintiff first contends that the Town of Easton's charter gives legislative powers only to the Town Meeting; under the charter, he concludes, the Selectmen are automatically executive officers and thus have no legislative immunity. We decline to tackle the complex and interesting issues of Massachusetts and federal law raised by this argument; instead, we assume that the Selectmen are local legislators. As such, they can claim immunity only for legislative acts; "whether an act is legislative turns on the nature of the act." *Bogan*, 523 U.S. at 54, 118 S.Ct. 966. Because defendants' acts were not legislative in nature, they cannot claim legislative immunity.

"The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Yakus v. United States*, 321 U.S. 414, 424, 64 S.Ct. 660, 88 L.Ed. 834 (1944). "Legislation ... looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908). Except for defining their own application procedures, on this record defendant Selectmen have determined no policy, changed no conditions, and made no new rules.[66] Indeed, the granting or denial of a permit is a classic

---

**66.** Defendants could argue, although they have not, that a legislative body's setting of its agenda is itself a legislative function. This argument would not prevail, however, since

the setting of an agenda for administrative or executive matters must surely be an administrative or executive act.

administrative or executive act: the decision-maker decides on a specific petition by applying standards already set forth in law.[67] Their acts were not legislative in nature, and legislative immunity does not apply.

### 2. Qualified Immunity

■ The doctrine of qualified immunity protects "state actors whose behavior has violated plaintiffs' rights as long as those rights were not at the time [of the violation] clearly established under the Constitution or laws of the United States." *Camilo–Robles v. Zapata,* 175 F.3d 41, 43 (1st Cir.1999) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Thus, the "classic question that a qualified immunity defense poses is whether the allegedly violated federal right was established with sufficient clarity that a reasonable government functionary should have conformed his conduct accordingly." *Camilo–Robles,* 175 F.3d at 43. Here, we must ask whether defendants should reasonably have known that retaliation against protected expression violated plaintiff's First Amendment rights.

■ The First Amendment dates to 1790, and its basic premise is, with the possible exception of the *Miranda* warnings, the best-known legal precept on the globe. *See Miranda v. Arizona,* 384 U.S. 436, 443, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In 1972, the Supreme Court stated that:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons .... [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (collecting cases). Since *Perry,* the federal courts have only expanded their scrutiny of retaliation against protected expression. *E.g., Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (allowing claim of retaliation against protected expression by independent contractor denied renewal of at-will government contract). The persistent enforcement of retaliation doctrine, and its consistent application to all levels of government, persuades us that defendants can enjoy no qualified immunity against plaintiff's retaliation claim. *See supra* at 169. Indeed, courts have long denied qualified immunity claims by state actors fighting claims similar to plaintiff's here. *See McBride v. Village of Michiana,* 100 F.3d 457, 458 (6th Cir.1996); *Vojvodich v. Lopez,* 48 F.3d 879, 886 (5th Cir.1995); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1507 (11th Cir.1990); *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1319 (9th Cir.1989). Most persuasively, in a highly similar case the First Circuit denied qualified immunity to Selectmen defending against allegations that they removed ZBA members because of their votes on controversial variances. *Stella v. Kelley,* 63 F.3d 71 (1st Cir.1995). This formidable backdrop of adverse precedent precludes defendants from claiming qualified immunity from the First Amendment retaliation claim. This claim must go to trial.

### V. CONCLUSION

For the foregoing reasons, we grant the moving defendants summary judgment on plaintiff's petition for redress, procedural due process, and substantive due process claims, as well as his allegation of an un-

---

**67.** In papers filed after oral argument, defendants argue that because plaintiff was the only LIP applicant before the Selectmen, the Board intended its decisions to provide policy for future such cases. In other words, the Selectmen contend that they were engaging in rulemaking through precedent, and that such rulemaking was legislative in character. Delineation of rules through case-by-case adjudication, however, is an administrative, judicial, or perhaps executive act. It is not legislative in character.

constitutional condition. We deny their motion as to plaintiff's retaliation claim.

SO ORDERED.